BRIEF FOR RESPONDENTS

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

NOS. 15-1330, 15-1331, 15-1332, 15-1333

———————

SNR WIRELESS LICENSECO, LLC, ET AL.,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

———————

ON PETITIONS FOR REVIEW OF AN ORDER OF THE
FEDERAL COMMUNICATIONS COMMISSION

———————

WILLIAM J. BAER
ASSISTANT ATTORNEY GENERAL

ROBERT B. NICHOLSON
ROBERT J. WIGGERS
ATTORNEYS

UNITED STATES
  DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

JONATHAN B. SALLET
GENERAL COUNSEL

JACOB M. LEWIS
ASSOCIATE GENERAL COUNSEL

MAUREEN K. FLOOD
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**1. Parties.**

The petitioners are SNR Wireless LicenseCo, LLC and Northstar Wireless, LLC.  The respondents are the Federal Communications Commission and the United States of America.  All parties that appeared before the agency are listed in petitioners' brief.

**2. Rulings under review.**

*Northstar Wireless, LLC and SNR WirelessCo, LLC Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands*, 30 FCC Rcd 8887 (2015).

**3. Related cases.**

This case has not previously been before this Court or any other court. We are aware of no pending cases related to this one.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................... iii

GLOSSARY .............................................................................. ix

JURISDICTION ..........................................................................1

INTRODUCTION .......................................................................2

QUESTIONS PRESENTED ..........................................................3

STATUTES AND REGULATIONS .................................................3

COUNTERSTATEMENT OF FACTS.............................................4

I.     REGULATORY BACKGROUND ...........................................4

II.    FACTUAL BACKGROUND ...................................................8

     A.    Auction 97 ...................................................................8

     B.    The *Order* on Review....................................................12

         1.    *De Facto* Control.....................................................12

             a.    The SNR, Northstar, and DISH Agreements..............12

             b.    Joint Bidding Behavior ...........................................18

             c.    Staff Grant of Other Applications.............................20

         2.    Management Agreements.............................................21

         3.    Allegations of Misconduct ..........................................21

     C.    Subsequent Developments .............................................22

SUMMARY OF ARGUMENT .....................................................23

STANDARD OF REVIEW ..........................................................26

ARGUMENT ............................................................................27

I.    THE COMMISSION REASONABLY DENIED SNR'S
      AND NORTHSTAR'S REQUESTS FOR VERY SMALL
      BUSINESS BIDDING CREDITS .........................................27

      A.    The Commission Reasonably Found DISH Had *De Facto*
            Control of Both Companies..................................................29

            1.    The Commission Followed Agency Precedent.............................29

            2.    SNR and Northstar Could Not Reasonably Rely on
                  Unpublished Staff Adjudicatory Actions to Interpret
                  the Commission's Control Rules .....................................32

            3.    The Commission Was Not Obligated to Consider or
                  Distinguish Applications Granted by Its Staff ................................37

            4.    The Commission Did Not Apply New Rules
                  Retroactively ....................................................................42

      B.    The Commission Reasonably Found Management and
            Other Agreements Gave DISH a Controlling Interest in
            SNR and Northstar ..............................................................49

II.   SNR AND NORTHSTAR HAD FAIR NOTICE OF THE
      COMMISSION'S CONTROL STANDARD.........................................52

III.  THE COMMISSION REASONABLY REFUSED TO
      NEGOTIATE BIDDING CREDIT ELIGIBILITY WITH
      SNR AND NORTHSTAR ....................................................54

CONCLUSION ............................................................................57

## TABLE OF AUTHORITIES

### CASES

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ...........................................................................5

*Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1 (D.C. Cir. 2009) ...........................................................................47

\*    *Amor Family Broad. Group v. FCC*, 918 F.2d 960 (D.C. Cir. 1990) ........................................ 37, 39, 41, 54

*AT&T v. FCC*, 454 F.3d 329 (D.C. Cir. 2006) .................................42

*Auer v. Robbins*, 519 U.S. 452 (1997) ..........................................27

*Checkosky v. SEC*, 23 F.3d 452 (D.C. Cir. 1994) ...........................49

\*    *Comcast v. FCC*, 526 F.3d 763 (D.C. Cir. 2008) ................... 25, 37, 38, 39, 54

*Conference Group, LLC v. FCC*, 720 F.3d 957 (D.C. Cir. 2013) .........................................................................42

*District 65, Distributive Workers of America v. NLRB*, 593 F.2d 1155 (D.C. Cir. 1978) ........................................33

*Doe v. Hampton*, 566 F.2d 265 (D.C. Cir. 1977) ...........................41

*Eagle Broad. Group, LTD v. FCC*, 563 F.3d 543 (D.C. Cir. 2009) ................................................................. 36, 37

*Eastern Carolinas Broadcasting Company v. FCC*, 762 F.2d 95 (D.C. Cir. 1985) ..........................................41

*Farmers and Merchants Mut. Tel. Co. of Wayland, Iowa v. FCC*, 668 F.3d 714 (D.C. Cir. 2011) .........................35

*FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012) ................................................................. 53, 54

*FCC v. Pottsville Broad. Co.*, 309 U.S. 134 (1940) ........................55

*FCC v. Schreiber*, 381 U.S. 279 (1965) .........................................54

*Freeman Eng'g Assocs. v. FCC*, 103 F.3d 169 (D.C. Cir. 1997) ..........................................................................2

*Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965 (D.C. Cir. 1999) .........................................................................4

*General Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) ................................................................. 52

*ICO Global Comm'cns Holdings v. FCC*, 428 F.3d 264 (D.C. Cir. 2005) ............................................ 52

*Jeff D. v. Andrus*, 899 F.2d 753 (9th Cir. 1989) ................ 33

*MCI Worldcom Network Servs., Inc. v. FCC*, 274 F.3d 542 (D.C. Cir. 2001) ......................................... 27

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........... 27

*Nat'l Tel. Co-op. Ass'n v. FCC*, 563 F.3d 536 (D.C. Cir. 2009) ........................................................ 26

*NetworkIP, LLC v. FCC*, 548 F.3d 116 (D.C. Cir. 2008) ................................................................. 53

*New York State Energy Research and Developmental Authority v. FERC*, 746 F.2d 64 (D.C. Cir. 1984) ................................................... 40

*Omnipoint Corp. v. FCC*, 78 F.3d 620 (D.C. Cir. 1996) ................................................................... 5

*Orange Park Florida T.V., Inc. v. FCC*, 811 F.2d 664 (D.C. Cir. 1987) .......................................... 40, 41

*PLMRS Narrowband v. FCC*, 182 F.3d 995 (D.C. Cir. 1999) ........................................................ 49

*Radio Athens, Inc. (WATH) v. FCC*, 401 F.2d 398 (D.C. Cir. 1968) ................................................ 54

*Rural Cellular Ass'n v. FCC*, 685 F.3d 1083 (D.C. Cir. 2012) ........................................................ 27

*Star Wireless v. FCC*, 522 F.3d 469 (D.C. Cir. 2008) ................................................................. 52

*Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254 (2011) ......................................................... 27

*Vernal Enters., Inc. v. FCC*, 355 F.3d 650 (D.C. Cir. 2004) ................................................ 37, 39, 56

## STATUTES

5 U.S.C. § 552(a)(2)(A ) ...................................................................35

5 U.S.C. § 706(2)(A) ........................................................................26

28 U.S.C. § 2342(1) ..........................................................................2

47 U.S.C. § 154(j) .............................................................................55

47 U.S.C. § 155(c)(1) ........................................................................39

47 U.S.C. § 307 ................................................................................4

47 U.S.C. § 309 ................................................................................4

47 U.S.C. § 309(a) ............................................................................47

47 U.S.C. § 309(j)(1) .........................................................................4

47 U.S.C. § 309(j)(3)(A) ....................................................................4

47 U.S.C. § 309(j)(3)(B) ....................................................................5

47 U.S.C. § 309(j)(3)(C) ....................................................................4

47 U.S.C. § 309(j)(3)(D) ....................................................................4

47 U.S.C. § 309(j)(4)(D) ....................................................................5

47 U.S.C. § 309(j)(4)(E) .....................................................................5

47 U.S.C. § 402(a) .............................................................................2

47 U.S.C. § 402(b) .............................................................................2

## REGULATIONS

47 C.F.R. § 0.445(a) ..........................................................................35

47 C.F.R. § 0.445(c) ..........................................................................35

47 C.F.R. § 0.445(d) ..........................................................................35

47 C.F.R. § 0.445(e) ..........................................................................35

47 C.F.R. § 1.4(b) ..............................................................................32

47 C.F.R. § 1.927(h) .................................................................... 55, 56

47 C.F.R. § 1.929(a) ..........................................................................55

47 C.F.R. § 1.929(a)(2) ......................................................................55

47 C.F.R. § 1.2104(g)(2) .............................................................. 22, 23

47 C.F.R. § 1.2105(b)(2) .............................................................. 55, 56

47 C.F.R. § 1.2109(b)......................................................................22

47 C.F.R. § 1.2110(b)(1)(i) ..............................................................6

47 C.F.R. § 1.2110(c)(2)(ii)(H).................................... 6, 21, 50, 51

47 C.F.R. § 1.2110(c)(5) ............................................................ 6, 50

47 C.F.R. § 1.2110(j)........................................................................10

47 C.F.R. § 1.2111(b)........................................................................8

47 C.F.R. § 1.2111(d) (2014) ...........................................................8

47 C.F.R. § 1.2112(b)(2) ........................................................... 10, 47

## ADMINISTRATIVE DECISIONS

*65 Applications for Authority to Construct and Operate Multipoint Distribution Service Stations at Three Transmitter Sites*, 10 FCC Rcd 11162 (1995) ....................................................................36

*Alaska Native Wireless, LLC*, 17 FCC Rcd 4231 (WTB 2002), *app. for review denied*, 18 FCC Rcd 11640 (2003).................................................30

*Amendment of Part I of the Commission's Rules – Competitive Bidding Procedures*, 15 FCC Rcd 21520 (2000) ...............................................6

*Application of Baker Creek Communications, LP*, 13 FCC Rcd 18709 (WTB 1998) ............................29

*Application of Winstar Broad. Corp. for a Construction Permit for New Television Station on Channel 21, Virginia Beach, Virginia*, 20 FCC Rcd 2043 (2005)..........................................8

*Bend Cable Communications, LLC d/b/a Bendbroadband Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 209 (MB 2007) .......................................38

*Cablevision Systems Corporation Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 220 (MB 2007)..........................................................38

*Charter Communications, Inc. Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 8557 (MB 2007) ........................................................38

*City of Crosslake, Minnesota d/b/a Crosslake Communications Petition for Deferral of Enforcement of July 1, 2007 Deadline in 47 C.F.R. § 76.1204(a)(1)*, 22 FCC Rcd 11754 (MB 2007) ........................................................38

*ClearCom L.P.*, 16 FCC Rcd 18627 (WTB 2001) ........................................55

*Colo Telephone Company et al.*, 22 FCC Rcd 13428 (MB 2007) ........................................................38

*Consolidated Requests for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 11780 (MB 2007) ........................................................38

*Eagle Broad. Group, LTD.*, 23 FCC Rcd 588 (2008), *aff'd*, 563 F.3d 543 (D.C. Cir. 2009) ........................36

*Ellis Thompson Corp.*, 9 FCC Rcd 7138 (1994) ........................................6, 33

*GCI Cable, Inc. Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 8576 (MB 2007) ........................................................38

*Great Plains Cable Television, Inc. et al. Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 13414 (MB 2007) ........................................................38

*Guam Cablevision, LLC, Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 11747 (MB 2007) ........................................................38

\* *Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, 10 FCC Rcd 403 (1994) ........................... 6, 7, 16, 30, 31, 33, 43

*Intermountain Microwave*, 12 FCC 2d 559 (1963) ........................................7

*Millennium Telcom, LLC d/b/a OneSource Communications Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 8567 (MB 2007) ........................................................38

*Steven R. Sixberry*, 15 FCC Rcd 15958 (WTB 2000) .................................................................................................47

*Streamlining the Commission's Antenna Structure Clearance Procedure and Revision of Part 17 of the Commission's Rules Concerning Construction, Marking and Lighting of Antenna Structures*, 15 FCC Rcd 8676 (2000) .........................................................32

*Trompex Corp.*, 18 FCC Rcd 3286 (WTB 2003) ...........................................56

*Two Way Radio of Carolina, Inc.*, 14 FCC Rcd 12035 (1999) ...............................................................................55

*United States Cellular Operating Co. Compliance with Section 22.942 of the Commission's Rules in the Rockford, IL MSA*, 15 FCC Rcd 4372 (2000) ......................................36

*Updating Part 1 Competitive Bidding Rules*, 30 FCC Rcd 7493 (2015) ....................................................................44

## OTHER AUTHORITIES

Public Notice, 16 FCC Rcd 2339 (WTB 2001) .............................................43

Public Notice, 21 FCC Rcd 10521 (WTB 2006) ...........................................34

Public Notice, 23 FCC Rcd 4572 (WTB 2008) .............................................43

Public Notice, 30 FCC Rcd 11622 (WTB 2015) ...........................................23

Public Notice, 30 FCC Rcd 630 (2015) ........................................................43

*\* Cases and other authorities principally relied upon are marked with asterisks.*

**GLOSSARY**

AWS                    Advanced Wireless Service

FCC                    Federal Communications Commission

ULS                    Universal Licensing System database

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

NOS. 15-1330, 15-1331, 15-1332, 15-1333

_____

SNR WIRELESS LICENSECO, LLC, ET AL.,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

_____

ON PETITIONS FOR REVIEW OF AN ORDER OF
THE FEDERAL COMMUNICATIONS COMMISSION

_____

BRIEF FOR RESPONDENTS

_____

## JURISDICTION

The *Order* on review was released on August 18, 2015. *Northstar Wireless, LLC and SNR WirelessCo, LLC Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands*, 30

FCC Rcd 8887 (2015).  This Court's jurisdiction rests on 47 U.S.C. § 402(a)

and 28 U.S.C. § 2342(1).[1]

## INTRODUCTION

The FCC conducts competitive auctions to allocate licenses to use

portions of the electromagnetic spectrum.  To encourage the participation of

small businesses (known as "designated entities"), the Commission awards

bidding credits (*i.e.*, discounts) that reduce the amount of designated entities'

winning bids.  At the same time, the Commission evaluates applications for

bidding credits closely to ensure those benefits only are awarded to *bona fide*

small businesses.

SNR and Northstar had no staff, no network facilities, and no track

record providing wireless service, yet in a recent FCC spectrum auction, they

placed more than $13 billion in winning bids – all backed by DISH Network

Corporation, a Fortune 250 corporation that owns an 85-percent stake in both

SNR and Northstar.  Going forward, DISH will provide all of the funds for

build-out of SNR's and Northstar's licenses and working capital.  Also,

---

[1] SNR and Northstar also filed notices of appeal under 47 U.S.C. § 402(b), which should be dismissed.  To the extent the *Order* on review dealt with their licenses, it rejected petitions to deny and allowed them to claim their licenses, so they have no basis for appeal under Section 402(b).  *Cf. Freeman Eng'g Assocs. v. FCC*, 103 F.3d 169, 177 (D.C. Cir. 1997).

2

pursuant to virtually identical agreements with SNR and Northstar, DISH will control almost every function required of a wireless network licensee.

Notwithstanding their relationships with DISH, SNR and Northstar claimed $3.3 billion in bidding credits set aside for very small businesses. In the *Order* on review, the Commission denied SNR and Northstar those benefits after finding they are controlled by DISH.

## QUESTIONS PRESENTED

This case presents the following questions for review:

1.  Whether the Commission reasonably found that because DISH, a multibillion dollar enterprise, controls and has a controlling interest in SNR and Northstar, the two companies were ineligible for bidding credits reserved for very small businesses in FCC spectrum Auction 97;

2.  Whether SNR and Northstar had fair notice of the Commission's rules and policies evaluating control of one entity by another;

3.  Whether the Commission reasonably denied SNR and Northstar an opportunity to restructure their relationships with DISH.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in an Addendum to this brief.

## COUNTERSTATEMENT OF FACTS

## I.    REGULATORY BACKGROUND

The Communications Act of 1934 authorizes the Commission to award licenses to use electromagnetic spectrum to provide communications services. *See* 47 U.S.C. §§ 307, 309. Since 1993, the Act has required the Commission to award most spectrum licenses "through a system of competitive bidding," *i.e.*, by auction. 47 U.S.C. § 309(j)(1).

The statute directs the Commission to design auction rules and procedures that "balance a number of potentially competing objectives." *Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999). These objectives include: developing and deploying new technologies and services "for the benefit of the public … without administrative or judicial delays," 47 U.S.C. § 309(j)(3)(A); avoiding "unjust enrichment," *id.* § 309(j)(3)(C); ensuring the "efficient and intensive use of the electromagnetic spectrum," *id.* § 309(j)(3)(D); and "promoting economic opportunity and competition … by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants," including several statutorily prescribed groups commonly referred to as "designated entities": "small businesses, rural telephone companies, and

businesses owned by members of minority groups and women." *Id.*

§ 309(j)(3)(B).[2]

To promote participation of these designated entities in spectrum auctions, the Commission has exercised its statutory authority to make them eligible for "bidding preferences" – commonly known as "bidding credits." *Id.* § 309(j)(4)(D).  Such bidding credits provide for a discount of the bid payments designated entities are required to make for licenses they win at auction in an amount measured as a percentage of their winning bids.  *See Omnipoint*, 78 F.3d at 626.  For example, if a company that meets the designated entity criteria qualifies for a 20 percent bidding credit in a particular auction, and if the company makes a winning bid of $500,000, it will be required to pay only $400,000 to obtain that license.

At the same time, the Commission must ensure the award of bidding credits does not result in the unjust enrichment of companies that are not *bona fide* small businesses.  47 U.S.C. § 309(j)(4)(E).  Thus, the Commission

---

[2] After the Supreme Court ruled in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), that race-conscious affirmative action programs are subject to strict scrutiny under the Constitution, the Commission eliminated any designated entity benefits based on the race or gender of an applicant's owners.  *See Omnipoint Corp. v. FCC*, 78 F.3d 620 (D.C. Cir. 1996).  Since that time, designated entity benefits have been available only to small businesses based on the size of such businesses.

attributes to an applicant the revenues of certain other entities. These include: (1) entities with *de facto* or *de jure* control of the applicant, which are deemed "affiliates," 47 C.F.R. § 1.2110(c)(5); and (2) any entity that manages the operations of an applicant or licensee pursuant to a "management agreement" and has authority to "make decisions" or "engage in practices" that "determine or significantly influence the nature or type of services offered by such an applicant." *Id.* § 1.2110(c)(2)(ii)(H). To be eligible for a bidding credit, a designated entity applicant must demonstrate that its gross revenues, in combination with those of its "attributable" interest holders, fall below auction-specific or service-specific limits. *Amendment of Part I of the Commission's Rules – Competitive Bidding Procedures*, 15 FCC Rcd 21520, 15323-34 (¶¶ 59-60) (2000) ("*Fifth R&O*"); 47 C.F.R. § 1.2110(b)(1)(i).

The Commission examines designated entity eligibility on a case-by-case basis. *Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, 10 FCC Rcd 403, 447 (¶ 80) (1994) ("*Fifth MO&O*"); *Fifth R&O*, 15 FCC Rcd at 15324 (¶ 61) (citing *Ellis Thompson Corp.*, 9 FCC Rcd 7138, 7138-39 (¶ 9) (1994)). However, FCC rules and orders identify a number of circumstances where control and affiliation may be found. Section 1.2110(c)(5) of the FCC's rules, 47 C.F.R. § 1.2110(c)(5), provides examples of affiliation that result in control. Commission orders implementing Section

6

309(j) do the same.  In a 1994 order, the Commission notified applicants for

designated entity benefits that:

> [A]greements between designated entities and strategic investors
> that involve terms (such as management contracts combined
> with rights of first refusal, loans, puts, *etc*.) that cumulatively are
> designed financially to force the designated entity into a sale (or
> major refinancing) will constitute a transfer of control under our
> rules.  We will look at the totality of circumstances in each
> particular case.  We emphasize that our concerns are greatly
> increased when a single entity provides most of the capital and
> management services and is the beneficiary of the investor
> protections.

*Fifth MO&O*, 10 FCC Rcd at 456 (¶ 96).

The same order explained that agreements between designated entities

and their investors would be scrutinized under the factors set forth in the

Commission's decision in *Intermountain Microwave*, 12 FCC 2d 559 (1963).

*Id.*, 10 FCC Rcd at 449-50 (¶ 83).  Pursuant to that decision, the potential for

one entity to control another is evaluated in light of the presence or absence

of the following six factors:

> (1) unfettered use of licensed facilities and equipment; (2)
> day-to-day operation and control; (3) determination of and
> carrying out of policy decisions; (4) employment,
> supervision, and dismissal of personnel; (5) payment of
> financial obligations; and (6) receipt of profits from
> operation of the licensed facilities.

*Id.*

After a designated entity obtains a bidding credit, it must retain its

license for the first five years.  47 C.F.R. § 1.2111(b).  This is known as the

"unjust enrichment period."  If a designated entity transfers or assigns its

license to a non-designated entity during that period, the Commission will

require it to repay all or part of its bidding credit.  *Id.* § 1.2111(d) (2014).

## II.    FACTUAL BACKGROUND

### A.    Auction 97

On May 19, 2014, the FCC's Wireless Telecommunications Bureau

announced FCC Auction 97, which proposed to auction 1,614 licenses in the

1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz Advanced Wireless

Service bands (collectively, the "AWS-3" bands).  In a second public notice,

the Wireless Bureau adopted procedures for the auction, including a filing

deadline of September 12, 2014 for "short-form applications."  *See* Public

Notice, 29 FCC Rcd 8386 (WTB 2014) ("*Auction Procedures Public

Notice*") (JA___).  The streamlined short-form application determines an

applicant's eligibility to participate in an auction.  *Id.* ¶ 63 (JA___); *see*

*Application of Winstar Broad. Corp. for a Construction Permit for New*

*Television Station on Channel 21, Virginia Beach, Virginia*, 20 FCC Rcd

2043, 2047 (¶ 10) (2005) ("Eligibility to participate in bidding is based on the

applicants' short-form applications and certifications.")

8

The Commission in Auction 97 made available a bidding credit of 25 percent for very small businesses. *Order* ¶¶ 13, 50 (JA___, ___). To qualify as a "very small business," a bidding credit applicant had to certify it had average gross revenues not exceeding $15 million for the previous three years. *Id.* The Wireless Bureau advised applicants to "review carefully the Commission's decisions regarding the designated entity provisions," and directed them to specific FCC rules and orders "for further guidance on the issue of *de facto* control." *Auction Procedures Public Notice* n.151 (JA___).

Auction 97 began on November 13, 2014, and ended on January 29, 2015, after 341 rounds of bidding. *Order* ¶ 12 (JA___). The auction raised a total of $41,329,673,325 from 31 winning bidders. *Id.* SNR won 357 of the 1,614 auctioned licenses, *id.* ¶ 3 (JA___), with $5,482,364,300 in gross winning bids. *Id.* ¶ 53 (JA___). Northstar won 345 of the auctioned licenses, *id.* ¶ 3 (JA___), with $7,845,059,400 in gross winning bids. *Id.* SNR and Northstar both claimed eligibility for the 25 percent bidding credit as very small businesses. The bidding credit reduced their bid amounts by $1,370,591,075 and $1,961,264,850, respectively. *Id.*

SNR and Northstar timely paid the full amount of their "net bids" (their gross bids minus the 25 percent bidding credit). They also filed "long-form applications," *id.* ¶ 12 (JA___), which determine a winning bidder's

9

eligibility to hold a license. *Auction Procedures Public Notice* ¶ 63 (JA___).

The Commission's rules require winning bidders claiming a bidding credit to

demonstrate their eligibility for that benefit in the more comprehensive long-

form application. *Id.* ¶ 231 (JA___); 47 C.F.R. § 1.2112(b)(2). Accordingly,

bidding credit applicants must file a copy of each agreement "affect[ing]"

their "designated entity status," including, *inter alia*, "partnership

agreements, shareholder agreements," and "management agreements" with

those applications. 47 C.F.R. § 1.2110(j); *Order* ¶ 21 (JA___).

SNR and Northstar were formed less than three months before Auction

97 and "ha[d] no officers or directors." *Order* ¶¶ 14, 17 (JA___, ___). In

their long-form applications, SNR and Northstar "reported average gross

revenues of $399,566 and zero, respectively, over the past three years." *Id.*

¶ 53 (JA___); *id.* ¶¶ 14, 17 (JA___, ___). A subsidiary of DISH Network

Corporation (DISH) owns an 85 percent interest in SNR, and a limited

liability company (SNR Wireless Management, LLC) owns a 15-percent

interest in the company. *Id.* ¶¶ 14, 17, 22 (JA___, ___, ___). Another DISH

subsidiary owns an 85 percent interest in Northstar, and a limited liability

company (Northstar Manager, LLC) owns a 15-percent interest in the

company. *Id.*

DISH is the nationwide licensee of 40 MHz of spectrum in the AWS-4 band, half of which is adjacent to the AWS-3 spectrum Northstar and SNR acquired in Auction 97.  *Id.* ¶ 20 (JA___).  Through other subsidiaries, DISH is a provider of Direct Broadcast Satellite video programming services. During the three years preceding Auction 97, DISH had average annual gross revenues of $13 billion.  *Id.* ¶ 4 (JA___).  A DISH subsidiary participated in Auction 97 but dropped out after round 26 without winning any licenses.  *Id.* ¶ 12 (JA___).

In support of their requests for bidding credits, SNR and Northstar attached to their long-form applications numerous agreements with DISH. The "terms and conditions" in the agreements between DISH and SNR were "substantially similar" to those in the agreements between DISH and Northstar.  *Id.* ¶ 20 (JA___).  "[N]either SNR nor Northstar attributed DISH's revenues," however, and each "certified that it was eligible for a 25 percent very small business bidding credit."  *Id.* ¶ 13 (JA___).

Eight parties filed petitions to deny SNR's and Northstar's request for bidding credits on the basis of the two companies' affiliation with DISH.  *Id.* ¶ 30 (JA___).  Two petitioners further argued that the Commission should not award SNR and Northstar some or all of the licenses they won in Auction 97. *Id.*

## B.    The *Order* on Review

On review, the Commission found DISH controlled and through management and other agreements held a controlling interest in SNR and Northstar. The Commission accordingly attributed DISH's revenues to each company, thereby rendering SNR and Northstar ineligible for the approximately $3.3 billion in bidding credits that they had requested. *Order* ¶¶ 4, 49 (JA___, ___). The agency then directed SNR and Northstar to either pay the full amount of their gross winning bids or deliver an irrevocable letter of credit in that amount within 30 days. *Id.* ¶¶ 152-156 (JA___-___).

### 1.    *De Facto* Control

The Commission found DISH had *de facto* control of SNR and Northstar based on a comprehensive review of the parties' agreements and the circumstances surrounding SNR's and Northstar's participation in Auction 97. *Order* ¶¶ 4, 49 (JA___, ___). Because the details of the parties' arrangements and the Commission's analysis were critical to its decision, we provide a thorough description below.

#### a.    The SNR, Northstar, and DISH Agreements

Multiple provisions in the agreements between SNR, Northstar, and DISH contributed to the Commission's conclusion that DISH controlled each company.

12

*First*, under the agreements, the Commission found, DISH "dominates the financial aspects of SNR's and Northstar's businesses." *Order* ¶ 84 (JA___). DISH paid 98 percent of SNR's and Northstar's winning bids in Auction 97 and "further agreed to provide all future funds for build-out and working capital." *Id.*; *id.* ¶ 25 (JA___). SNR and Northstar also "lack authority to raise capital" from other sources "without DISH's consent." *Id.* ¶ 85 (JA___); *id.* ¶ 25 (JA___).

*Second*, the agreements provide DISH "19 wide-ranging" investor protections that, the Commission found, "go well beyond" "typical" protections "for a purely financial investor that does not intend to control the day-to-day operations of the company in which it has invested." *Id.* ¶ 63 (JA___); *id.* ¶¶ 59-68 (JA___-___). For example, SNR and Northstar "may not deviate more than ten percent from any line item in an annual budget without DISH's consent." *Id.* ¶ 65 (JA___). The consequence, the Commission observed, is that without DISH's prior approval, neither company can spend more (or even less) than ten percent of the line item for something as trivial as office supplies. *Id.* By contrast, protections accorded other non-controlling investors in SNR and Northstar limit their decision-making to "'major corporate decisions that fundamentally affect their interests.'" *Id.* n.232 (JA___).

*Third*, the Commission found, "DISH controls SNR's and Northstar's daily operations." *Id.* ¶ 69 (JA___).  Management Services Agreements designate a DISH subsidiary as the Operations Manager for both SNR and Northstar.  The Operations Manager has authority over virtually all of the "key functions" of a wireless network licensee, including: "engineering and construction of the network; billing and collection services; marketing, sales, advertising, and promotion; and the provision of" essential services, such as 911.  *Id.* ¶ 123 (JA___).  SNR and Northstar can fire the Operations Manager for cause only through "a complex, costly, and lengthy process, culminating in arbitration," and without cause only with 12 months' notice of termination, coupled with substantial financial penalties should they do so; these provisions "substantiate[d]" the Commission's determination that SNR and Northstar do not control operation of their own businesses.  *Id.* ¶ 75 (JA___).

*Fourth*, the Commission found, "any profits that are generated" from the businesses "will only accrue to DISH." *Id.* ¶ 90 (JA___).  This is because "SNR and Northstar must first repay … billions of dollars in loans" before "realizing any profits from their business operations."  *Id.* ¶ 88 (JA___).  SNR's and Northstar's only income comes from a modest annual management fee, which the Commission found "hardly sufficient to support the number of management, financial and technical employees … required"

14

to "construct and operate a wireless telecommunications network spanning the nation." *Id.* ¶ 74 (JA___); *id.* 79-81, 90, 92 (JA___-___, ___, ___).[3]

*Fifth*, the agreements between SNR, Northstar, and DISH include "a number of provisions that restrict SNR and Northstar from critical decisions that would normally remain within an independent entity's control." *Id.* ¶ 94 (JA___); *id.* ¶¶ 95-108 (JA___-___).

Prominent among those are provisions that "compel[]" SNR and Northstar "to use technology that is compatible with DISH's own systems." *Id.* ¶ 96 (JA___). This requirement is "unnecessarily restrictive," the Commission's explained, because neither SNR nor Northstar "have an operating wireless system." *Id.* As a result, "they must wait for DISH" (which has not yet built its own wireless network) "to select a technology and then ensure that their own systems are interoperable." *Id.* ¶¶ 96-97 (JA___-___). This cedes to DISH authority to determine SNR's and Northstar's network technology and services. *Id.* ¶ 97 (JA___). It also means that SNR and Northstar "cannot commence *any* construction of their networks unless and until DISH unilaterally chooses a technology, notwithstanding that they have an obligation under [the Commission's] rules to build out a substantial

---

[3] The fee amounts can be found at paragraphs 74, 79, and 81 of the confidential version of the *Order*. (JA___, ___, ___).

portion of their networks in six years or risk shortening the term of their licenses." *Id.* ¶ 99 (JA___) (emphasis in original).

In addition, SNR and Northstar must "secure written permission from DISH … prior to acquiring any new spectrum licenses" even though DISH is under no obligation to pay for those licenses. *Id.* ¶ 66 (JA___); *id.* ¶ 98 (JA___). The Commission found the "inability" of SNR and Northstar "to determine the spectrum licenses" required "for the proper operation of their businesses undermines their claims of independence." *Id.* ¶ 98 (JA___).

Further, the agreements "essentially dictate when SNR and Northstar should sell their interests and exit the business." *Id.* ¶ 100 (JA___). SNR and Northstar cannot transfer their interests during the first 10 years of operation without DISH's consent. *Id.* ¶ 101 (JA___). After that, SNR and Northstar only can sell their interests subject to (1) DISH's right of first refusal and (2) a tag-along right that requires any buyer also to purchase DISH's 85 percent interest in each company. *Id.* These provisions, the Commission explained, are "designed to ensure that any sale by [SNR or Northstar is] to DISH." *Id*.

Also, the Commission found the agreements "'cumulatively are designed to force [SNR and Northstar] into a sale'" following expiration of the unjust enrichment period. *Id.* ¶ 105 (JA___) (quoting *Fifth MO&O*, 10 FCC Rcd at 456 (¶ 96)). SNR and Northstar must repay 50 percent of their

16

multibillion dollar loans from DISH between the fifth and seventh years following acquisition of the Auction 97 licenses, followed by a balloon payment for the entire remaining balance at the end of the seventh year. *Id.* The Commission questioned whether SNR and Northstar will have the "considerable revenues necessary to meet the[se] large repayment obligations" – particularly in light of "interoperability obligations" that prevent SNR and Northstar from "provid[ing] any revenue-generating service" until DISH unilaterally chooses a wireless network technology. *Id.* ¶ 104 (JA___).  The Commission concluded that "SNR and Northstar are committed to repayment terms that will be difficult, if not impossible to manage unless they exercise [a] put option" that requires DISH to buy out their interests during a 30-day window at the end of the fifth year, when the unjust enrichment period ends.  *Id.* ¶ 105 (JA___); *id.* ¶¶ 102, 103 (JA___, ___).

Finally, if SNR and Northstar fail to qualify for designated entity bidding credits, DISH can require them to transfer their spectrum licenses to DISH for the sum of their investments minus liquidated damages. *Id.* ¶ 108 (JA___).  The Commission found DISH's "ability to effectively terminate the continued existence of these companies" should they "fail" to "help DISH

17

secure discounted licenses" provided additional support for its "conclusion that DISH holds *de facto* control." *Id.*

### b. Joint Bidding Behavior

The "bidding conduct" of SNR, Northstar, and DISH in Auction 97 "corroborate[d the Commission's] determination" that DISH had *de facto* control of SNR and Northstar. *Order* ¶ 5 (JA___); *id.* ¶¶ 109-114 (JA___-___).

Prior to Auction 97, SNR and Northstar each entered into a Joint Bidding Agreement with DISH. The agreements, which were virtually identical, contained, *inter alia*, a schedule of target licenses, a "preferred priority order" for securing the licenses, maximum price, and bidding cap for each license. *Id.* ¶ 110 (JA___); *id.* ¶¶ 28 (JA___). Both SNR and Northstar were "required to use [their] 'reasonable best efforts' to acquire th[ose] licenses." *Id.* ¶ 28 (JA___).

Each Joint Bidding Agreement also established an "Auction Committee" for each company comprised of two members appointed by the LLC Manager of SNR and Northstar, respectively, and one member for each committee appointed by DISH. *Id.* ¶ 28 (JA___). The same DISH executive served on both Auction Committees. *Id.* n.321 (JA___). Members of each Auction Committee discussed bidding decisions during daily conference

18

calls, *id.,* and any deviation from the schedule of licenses to be bid on in the

Joint Bidding Agreements required the prior written approval of each Auction

Committee member. *Id.* ¶ 114 (JA___).  The Commission found this

arrangement provided DISH with "effective veto power over the daily

bidding activity." *Id.*

Reviewing SNR's and Northstar's bidding behavior, the Commission

found "many instances" during Auction 97 where the companies "placed

identical bids for identical licenses in the same markets in the same rounds."

*Id.* ¶ 111 (JA___).  SNR and Northstar also each accepted randomly

generated winning bid assignments in lieu of bidding against one another

after they each bid the same amount for the same license.  *Id.* ¶¶ 111-112

(JA___-___).

Moreover, SNR and Northstar "acted in a clearly concerted fashion" to

"preserve" their eligibility to continue placing bids. *Id.* ¶ 111 (JA___).  In

round 238, SNR incurred an $11 million payment to withdraw a bid; this

enabled Northstar to bid on the same license in round 239 at a price that was

$11 million less.  *Id.*  While this "added $11 million to SNR's balance sheet,"

the Commission found it was "an economic wash" for SNR, Northstar, and

DISH combined.  *Id.*  This behavior led the Commission to question why

SNR would withdraw a bid "to the detriment of its non-DISH owners" if it was truly acting in its own interest. *Id.* ¶¶ 111, 113 (JA___, ___).

### c. Staff Grant of Other Applications

The Commission found unavailing SNR's and Northstar's argument that DISH's participation in each company was structured in accordance with long-form applications previously granted by the Wireless Bureau. *Order* ¶ 121 (JA___). The Commission explained that its analysis of SNR's and Northstar's relationships with DISH took into account not only the terms of agreements between the parties, but also (1) SNR's and Northstar's "multibillion dollar financial dependency" on DISH to build-out and operate networks capable of supporting hundreds of licenses nationwide and (2) their "parallel course of conduct" in Auction 97, which "could not have been accidental." *Id.* ¶ 120 (JA___).

The Commission also noted that SNR and Northstar "d[id] not claim to have relied on any reported decisions in which the Commission staff – much less the Commission – ha[d] articulated any basis" to construe the FCC's rules "to permit the coupling of such features" in prior applications "with the kind of extensive 'investor protections' and management responsibilities vested in DISH." *Id.* ¶ 121 (JA___). The Commission explained it was not bound by prior staff actions, in any event, and "expressly disavow[ed]" those

actions to the extent they are "inconsistent with" its own interpretation of FCC rules and orders. *Id.* n.354 (JA___).

### 2. Management Agreements

The Commission further held Section 1.2110(c)(2)(ii)(H) of its rules provided "[a] separate and independent legal basis" to find DISH had a controlling interest in SNR and Northstar. *Order* ¶ 122 (JA___). The Commission found SNR's and Northstar's Management Services Agreements with DISH, "in combination with the interoperability requirements" in other agreements, gave DISH "'authority to make decisions or otherwise engage in practices or activities that determine, or significantly influence … [t]he nature and types of services offered by'" each company. *Id.* ¶ 123 (JA___) (quoting 47 C.F.R. § 1.2110(c)(2)(ii)(H)) (alterations in original).

### 3. Allegations of Misconduct

Finally, the Commission found no merit in allegations SNR and Northstar failed to adequately disclose their relationships and joint bidding arrangements with DISH. *Order* ¶¶ 129-136, 156 (JA___-___, ___). The record showed SNR and Northstar documented their ownership structures and the existence of their bidding arrangements in conformance with the FCC's rules. *Id.* It also showed SNR's and Northstar's bidding activity did not violate FCC rules in effect during Auction 97. *Id.* ¶¶ 133-136 (JA___-___).

21

The Commission thus found no "grounds to render an adverse decision as to [SNR's and Northstar's] basic qualifications to hold licenses," *id.* ¶ 9 (JA___), or to re-auction some or all of the licenses SNR and Northstar won in Auction 97. *Id.* ¶¶ 137-145 (JA___-___).

### C.  Subsequent Developments

Shortly after the Commission adopted the *Order*, SNR and Northstar notified the agency they would pay the full bid amount for some of the licenses they won in Auction 97 and default on others.

Under the Commission's rules, when an auction participant places a bid, it assumes a binding obligation to pay the full amount of its accepted winning bid at the close of an auction.  47 C.F.R. § 1.2104(g)(2); *Auction Procedures Public Notice* ¶ 214 (JA___).  A bidder who reneges on that obligation is subject to a default payment. *Id*. §§ 1.2104(g)(2), 1.2109(b).[4]

On October 1, 2015, the Wireless Bureau notified SNR and Northstar of their interim default payments, which equaled 15 percent of the aggregate amount of the gross winning bids for the defaulted licenses ($181,635,840 for

---

[4] Under FCC rules, as applied in Auction 97, a default payment has two components: (1) the difference between the defaulted bid and the winning bid the next time the license is auctioned and (2) a payment equal to 15 percent of the defaulter's bid or the subsequent winning bid, whichever is less.  If a subsequent winning bid equals or exceeds the defaulted bid, the total default payment is 15 percent of the defaulted bid.  47 C.F.R. § 1.2104(g)(2).

SNR and $333,919,350 for Northstar).[5]  That same day, SNR and Northstar

remitted funds which, when added to the funds they already had on deposit

with the Commission, were sufficient to satisfy their interim default payment

and to purchase those licenses they wished to retain.[6]  On October 27, 2015,

the Wireless Bureau granted SNR's and Northstar's applications for the

retained licenses.  Public Notice, 30 FCC Rcd 11622 (WTB 2015).

## SUMMARY OF ARGUMENT

The Commission reasonably denied SNR and Northstar bidding credits

set aside for very small businesses.  Applying the control standard established

by its rules and published decisions, the Commission found DISH controlled

and held a controlling interest in SNR and Northstar.  The companies'

financial dependency on DISH is enormous; DISH's managerial

---

[5] Letter to Mark F. Dever, Esq., Counsel for Northstar Wireless, LLC, from Roger C. Sherman, Chief, Wireless Telecommunications Bureau, FCC, 30 FCC Rcd 10700 (Oct. 1, 2015) (JA___); Letter to Ari Q. Fitzgerald, Esq., Counsel for SNR Wireless LicenseCo, LLC, from Roger C. Sherman, Chief, Wireless Telecommunications Bureau, FCC, 30 FCC Rcd 10704 (Oct. 1, 2015) (JA___); 47 C.F.R. § 1.2104(g)(2).  Because the Commission cannot determine the full amount of the default payment until the licenses are re-auctioned, it assessed an interim default payment.

[6] Letter from Mark F. Dever, Esq., Counsel for Northstar Wireless, LLC, to Jean Kiddoo, Deputy Chief, Wireless Telecommunications Bureau, FCC, ULS File No. 0006670613 (Oct. 1, 2015) (JA___); Letter from Ari Q. Fitzgerald, Counsel to SNR Wireless LicenseCo, LLC, to Jean Kiddoo, Deputy Bureau Chief, Wireless Telecommunications Bureau, FCC, ULS File No. 0006670667 (Oct. 1, 2015) (JA___) ("*SNR Default Letter*") (JA___).

responsibilities include virtually all the functions required of a wireless network licensee; and DISH enjoys investor protections that extend well beyond those deemed necessary by other investors in both companies. SNR's and Northstar's joint bidding activity in Auction 97 corroborated that finding.

1. SNR and Northstar do not dispute these facts. Instead, they argue they relied on "agency precedent" in structuring their relationships with DISH. In fact, SNR and Northstar disregarded relevant agency precedent, including the rules and published orders the Wireless Bureau directed them to review prior to Auction 97. That precedent placed SNR and Northstar on notice of the *de facto* control standard the Commission would apply after reviewing the parties' agreements.

The "agency precedent" on which SNR and Northstar purportedly relied is derived from terms in agreements submitted with a handful of applications granted by the Wireless Bureau without discussion. That is not precedent at all. Absent a published written decision explaining its basis, the grant cannot be used to interpret FCC rules and policies, nor can it bind anyone other than the original applicant. Moreover, the Commission has employed a totality-of-the-circumstances approach to evaluating the control of one entity by another since the inception of the designated entity program. SNR and Northstar could not reasonably assume incorporating some terms

24

from agreements filed with applications between different parties involving different winning bids for different licenses would guarantee grant of their own.

Even if applications granted by the Wireless Bureau established staff precedent, the Commission was not bound to follow it. *See Comcast v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008). Here, the Commission reasonably disavowed the prior actions of its staff insofar as they are inconsistent with the Commission's own interpretation of its rules and policies in the *Order*.

The Commission also did not apply new rules retroactively. Instead, it applied its existing rules in an adjudicatory proceeding. Specifically, the Commission applied its longstanding totality-of-the-circumstances approach to evaluating control to the particular facts presented by the SNR and Northstar applications. The facts included, *inter alia*, the magnitude of SNR's and Northstar's winning bids, DISH's unilateral right to choose their network technology, and their joint bidding behavior in Auction 97.

2. SNR and Northstar received adequate notice of the Commission's rules and policies for evaluating the control of one entity by another. Prior to Auction 97, the Wireless Bureau issued a Public Notice that referred designated entity applicants to relevant rules and published orders. SNR and Northstar ignored that precedent in favor of unpublished and unexplained

25

adjudicatory actions by Commission staff.  SNR and Northstar had no reasonable basis to rely on those staff actions for guidance in the face of the Commission's published guidance.

3.  Finally, the Commission did not depart from established practice when it refused to allow SNR and Northstar to restructure their relationships with DISH.  There is no such Commission practice.  On the facts of this case, the Commission reasonably declined to offer SNR and Northstar a "second chance" to demonstrate their eligibility for very small business bidding credits.  The Commission found providing SNR and Northstar an opportunity to amend their agreements with DISH would discourage compliance with the designated entity rules.  Those amendments also could not erase their joint bidding behavior, which contributed significantly to the Commission's finding that DISH controlled SNR and Northstar.

## STANDARD OF REVIEW

SNR and Northstar bear a heavy burden to establish that the *Order* on review is "arbitrary, capricious [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).  Under this "highly deferential" standard, the Court presumes the validity of agency action.  *E.g.*, *Nat'l Tel. Co-op. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009).  The Court must affirm unless the Commission failed to consider relevant factors or made a clear error in judgment.  *E.g.*,

26

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

Similarly, this Court gives a "high level of deference" to the FCC's interpretation of its own orders and regulations.  *MCI Worldcom Network Servs., Inc. v. FCC*, 274 F.3d 542, 548 (D.C. Cir. 2001); *see Auer v. Robbins*, 519 U.S. 452, 461 (1997).  The Court accepts the agency's interpretation "unless [it] is plainly erroneous or inconsistent with the regulations."  *Rural Cellular Ass'n v. FCC*, 685 F.3d 1083, 1093 (D.C. Cir. 2012) (quoting *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2261 (2011) (internal quotation marks, citations, and alteration omitted)).

## ARGUMENT

## I.    THE COMMISSION REASONABLY DENIED SNR'S AND NORTHSTAR'S REQUESTS FOR VERY SMALL BUSINESS BIDDING CREDITS

SNR and Northstar both were formed less than three months before the start of Auction 97.  The companies had no staff, no network facilities, and no track record providing wireless service.  Yet in Auction 97, they collectively placed more than $13 billion in winning bids backed almost entirely by loans from DISH, which has an 85 percent equity interest in each company.

Prior to the auction, SNR and Northstar entered into Joint Bidding Agreements with DISH that identified target licenses and maximum bid

27

amounts.  During the auction, they participated in daily conference calls with the same DISH executive, who could veto their bidding decisions.  In many instances, SNR and Northstar placed identical bids for the same licenses.

Going forward, DISH will provide all of the funds for build-out of SNR's and Northstar's licenses and working capital.  DISH will choose a network technology for SNR and Northstar, build their networks, manage and operate those networks, and market their services.  Without DISH's consent, SNR and Northstar cannot borrow money, acquire spectrum licenses, or sell their interests.  They also cannot fire DISH as their Operations Manager without incurring significant financial penalties.  In return, SNR and Northstar are paid a modest annual management fee for five years, at which point they must either repay their multibillion dollar loans to DISH over 24 months or sell their licenses to DISH.

SNR and Northstar do not dispute these facts, which provide overwhelming support for the Commission's determination that DISH controls each company.  They nonetheless claim very-small-business bidding credits because, they contend, their arrangements with DISH mirror those between designated entities that have received bidding credits and their equity investors.  Pet. Br. 29-31.  They are wrong, for the reasons set forth below.

28

### A.  The Commission Reasonably Found DISH Had *De Facto* Control of Both Companies

### 1.  The Commission Followed Agency Precedent

SNR and Northstar argue they followed Commission precedent in structuring their relationships with DISH.  Pet. Br. 29-35.  In fact, they ignored that precedent.

Prior to Auction 97, the Wireless Bureau directed potential bidders to FCC rules and orders providing guidance on how the agency determines control of one entity by another.  *Auction Procedures Public Notice* ¶ 85 & n.151 (JA___).  One of those orders was *Application of Baker Creek Communications, LP*, 13 FCC Rcd 18709 (WTB 1998).  In *Baker Creek,* the Wireless Bureau held that Hyperion, "ostensibly a non-controlling investor," "possess[ed] an impermissible level of control over the daily operations of Baker Creek" under the Commission's designated entity rules.  *Order* ¶ 70 (JA___).

SNR and Northstar disregarded *Baker Creek*.  Their arrangements with DISH are analogous to Baker Creek's arrangements with Hyperion.  *Id.* ¶¶ 70, 72 (JA___,___).  DISH, the Commission found, has "effectively the same authority as Hyperion" to supervise build-out and operation of SNR's and Northstar's networks and to manage their marketing, record keeping, contract negotiations, employment decisions, representation before

29

government, system maintenance, engineering, design, and operation.  *Id.*

¶ 72 (JA___); *id.* ¶ 70 (JA___).  In *Baker Creek*, that authority was sufficient

to support a finding of *de facto* control.

     SNR and Northstar also failed to heed Commission warnings about

circumstances that may trigger a *de facto* control finding.  The Commission

warned applicants that its "concerns are greatly increased" when "a single

entity provides most of the capital and management services and is the

beneficiary of investor protections."  *Fifth MO&O*, 10 FCC Rcd at 456

(¶ 96).  The Wireless Bureau reiterated "such a corporate structure would be

subject to close examination" in a case emphasizing the absence of such

management services by the investor.  *Alaska Native Wireless, LLC*, 17 FCC

Rcd 4231, 4240 (¶ 18) (WTB 2002), *app. for review denied*, 18 FCC Rcd

11640 (2003).  Consistent with that guidance, the Commission found that

DISH "plays a significant role" in SNR's and Northstar's "day-to-day

operations" and enjoys protections that "extend significantly beyond" those

that are "usual and customary" for purely financial investors.  *Order* ¶ 63

(JA___); *id.* ¶¶ 5, 59, 71-72, 118-119 (JA___; ___, ___, ___- ___, ___-___).

     Further, SNR and Northstar disregarded the Commission's warning

that "a 'put' in combination with other terms to an agreement may result in an

applicant not retaining *de facto* control" – particularly where those terms

"cumulatively are designed financially to force the designated entity into a sale." *Fifth MO&O*, 10 FCC Rcd at 455, 456 (¶¶ 90, 95, 96).[7]  The Commission found the timing of SNR's and Northstar's right to exercise their put options (coincident with expiration of the unjust enrichment period), the limited window during which the put must be exercised (30 days), and the draconian effect if the put is not exercised (DISH's consent is required of any future sale to a third party and DISH's right of first refusal is triggered) – in combination with SNR's and Northstar's obligation to repay their multibillion dollar loans between years five and seven – are likely to force a sale of their licenses to DISH when the unjust enrichment period ends. *See Order* ¶¶ 100-103, 118-119 (JA___-___, ___-___).

SNR and Northstar thus cannot credibly argue they relied on Commission precedent in structuring their relationships with DISH.  Had they done so, their agreements would not have included terms the agency warned would cede *de facto* control to an ostensibly non-controlling investor.

---

[7] "A 'put' option gives the holder the right to sell a share of stock at a specified price at any time up to the expiration date.'" *Fifth MO&O*, 10 FCC Rcd at 455 (¶ 92).

## 2. SNR and Northstar Could Not Reasonably Rely on Unpublished Staff Adjudicatory Actions to Interpret the Commission's Control Rules

The "agency precedent" SNR and Northstar claim to have followed is based on the asserted character of provisions in agreements filed with long-form applications granted by the Wireless Bureau. *See* Pet. Br. 29-32. No narrative or explanation accompanied each grant; Wireless Bureau staff made a one-word entry ("granted") in the FCC's Universal Licensing System ("ULS") database,[8] and memorialized the date of that action in a weekly Public Notice. *See* 47 C.F.R. § 1.4(b). (To illustrate, Attachment A provides a screenshot of the ULS entry for the transaction involving Denali Spectrum License, LLC (Denali). *See* Pet. Br. 14-16.) SNR and Northstar could not reasonably rely on those applications to interpret the agency's control rules, for two reasons.

First, the Commission repeatedly has reminded bidding credit applicants that "whether *de facto* control exists will depend on the totality of

---

[8] ULS is an "integrated database and automated processing system" that is used for "electronic filing of wireless applications" and "licensing information." *Streamlining the Commission's Antenna Structure Clearance Procedure and Revision of Part 17 of the Commission's Rules Concerning Construction, Marking and Lighting of Antenna Structures*, 15 FCC Rcd 8676, 8682 n.43 (2000). ULS can be accessed at http://wireless.fcc.gov/uls/index.htm?job=home

32

the circumstances in the particular case." *Fifth MO&O*, 10 FCC Rcd at 447 (¶ 80); *see Ellis Thompson Corp.*, 9 FCC Rcd at 7139 (¶ 10).  Under that approach, a contract provision that might not confer *de facto* control in one context could be part of an overall set of terms and circumstances that would confer such control in a different context.  *See District 65*, *Distributive Workers of America v. NLRB*, 593 F.2d 1155, 1161 (D.C. Cir. 1978) ("[w]hile any one of" an employer's acts "might, in a different case, … be permissible employer cooperation", "view[ing] the totality of circumstances", those acts constituted an unfair labor practice); *Jeff D. v. Andrus*, 899 F.2d 753, 760 (9th Cir. 1989) (reading "individual sections" of an agreement "out of context" can "achieve a result not originally contemplated by parties").  And, in fact, considerations outside the four corners of the SNR and Northstar agreements – notably, SNR's and Northstar's "multibillion dollar financial dependency" on DISH and their joint bidding behavior in Auction 97 – contributed to the

33

Commission's *de facto* control finding. *Order* ¶¶ 5, 120 (JA___, ___).[9] SNR
and Northstar thus could not reasonably assume incorporating terms from
agreements filed with multiple other applications would guarantee grant of
their own given the Commission's longstanding approach to determining
control.[10]

Second, the mere grant of an application is not agency precedent unless
it is accompanied by a published document explaining its consistency with
the Commission's control standard. FCC rules provide that only published
"[a]djudicatory opinions and orders", "rulemaking documents or summaries
thereof", and "[f]ormal policy statements and interpretations designed to have

---

[9] SNR and Northstar assert they largely modeled their agreements with
DISH on agreements between Denali, a designated entity, and Cricket
Communications, Inc. (Cricket), a non-controlling investor. Pet. Br. 14-16 &
Appendix A. Apart from a joint bidding agreement, the Denali agreements
covered one regional license the designated entity acquired in Auction 66
with a gross winning bid of $365,445,000 ($274,083,750 net after bidding
credits). *See* Public Notice, 21 FCC Rcd 10521 (WTB 2006). Unlike SNR
and Northstar, Denali entered into an interoperability commitment with
Cricket, an existing wireless provider, *Order* ¶ 126 & n.364 (JA___) & pp.
44-45, 51-52, below, and Denali and Cricket did not engage in the joint
bidding behavior that contributed to the Commission's *de facto* control
finding. *See* pp. 18-19, above.

[10] SNR and Northstar changed some of those terms. For example, DISH
must approve any expenditure of more than $2 million under the SNR and
Northstar agreements. Pet. Br. Appendix A at A4. The term on which it is
modeled established a $10 million threshold. *Id.*

general applicability" "may be relied upon, used, or cited as precedent by the Commission or private parties."  47 C.F.R. § 0.445(a), (c), (d), (e).  In other words, binding agency precedent is limited to public documents that explain, interpret, or apply FCC rules and policies.  That is why the Wireless Bureau directed Auction 97 participants to published orders, like *Baker Creek*.  *See Auction Procedures Public Notice* at ¶ 85 & n.151 (JA___).  Unsurprisingly, SNR and Northstar do not identify any instance where the agency advised aspiring designated entities to search filings supporting grants made in the ULS database for guidance on the Commission's control standard.

If the agency had given such advice, applicants for designated entity benefits likely would have been unable to locate the underlying agreements relied on by SNR and Northstar.  Only summaries of the agreements associated with the Denali transaction were filed in ULS; the agreements themselves were submitted to the agency under seal.  Pet. Br. 15 n.13.  Commission precedent cannot be derived from documents that are not available to the public.  *See* 5 U.S.C. § 552(a)(2)(A ); 47 C.F.R. § 0.445(e); *cf. Farmers and Merchants Mut. Tel. Co. of Wayland, Iowa v. FCC*, 668 F.3d 714, 722 (D.C. Cir. 2011) (petitioner's reliance on an FCC decision under judicial seal raised due process concerns).

The Commission has rejected similar attempts to divine agency policy from applications granted without explanation by its staff.  In *65 Applications for Authority to Construct and Operate Multipoint Distribution Service Stations at Three Transmitter Sites*, 10 FCC Rcd 11162, 11175 (¶ 41) (1995), the Commission refused to consider an "analysis of the facts surrounding the grants" of two applications "without discussion or explanation by [its] staff" because "[t]he staff did not purport to rely in any way on the facts which … [the] petitioners … assert[ed] were the basis for those grants."  Similarly, in *United States Cellular Operating Co. Compliance with Section 22.942 of the Commission's Rules in the Rockford, IL MSA*, 15 FCC Rcd 4372, 4378 (¶ 10) (2000), the Commission held that "grants of applications by Public Notice in which the staff did not specifically rule on the appropriateness of using a voting trust … do not affirmatively provide any basis for use of such trusts." *See also Eagle Broad. Group, LTD.*, 23 FCC Rcd 588, 597 (¶ 17) (2008) (holding a "staff action" that "renewed [a] license … without written decision" was "irrelevant to [the Commission's] analysis" of petitioner's renewal application), *aff'd*, 563 F.3d 543 (D.C. Cir. 2009).  Likewise here, SNR and Northstar are not entitled to rely on propositions that are "reverse-engineered" from applications granted by the Wireless Bureau without discussion or publication in the FCC Record or the Federal Register.

36

The Commission therefore did not depart from its precedent for assessing *de facto* control in this case.  Rather, applying the same analysis employed in *Baker Creek* and other published decisions, *see* pp. 29-31, above, the Commission reasonably found that DISH had *de facto* control of SNR and Northstar.

### 3.  The Commission Was Not Obligated to Consider or Distinguish Applications Granted by Its Staff

It is "'well-established … that an agency is not bound by the actions of its staff if the agency has not endorsed those actions.'"  *Comcast*, 526 F.3d at 769 (quoting *Vernal Enters., Inc. v. FCC*, 355 F.3d 650, 660 (D.C. Cir. 2004)); *see also Amor Family Broad. Group v. FCC*, 918 F.2d 960, 962 (D.C. Cir. 1990); *Eagle Broadcasting*, 563 F.3d at 554.  SNR and Northstar make various attempts to evade *Comcast* and related cases from this Circuit.  Pet. Br. 35-41.  Each fails.

SNR and Northstar argue the "*Comcast* line of cases involves sporadic action by agency staff," not "a body of agency law rooted in the Bureau's case-by-case decision-making."  *Id*. 40.  This distinction is illusory.  Nothing in *Comcast* limits the number of unreviewed staff decisions that the Commission may disavow, and in any event, *Comcast* involved more than a "handful of unchallenged staff actions."  *Id.*  Prior to the Commission's denial of Comcast's request to waive the ban on leasing set-top boxes with an

37

integrated security element, the FCC's Media Bureau granted 140 waivers of the same restriction.[11]

Moreover, the *Comcast* court rejected the argument that a broad delegation to staff can produce a body of agency "common law" that binds the Commission.  Pet. Br. 37.  "To be sure," the court explained, "in the absence of Commission action to the contrary, [staff] decisions have the force of law."  *Comcast*, 526 F.3d at 770.  "But this simply means that those rulings are binding on the parties to the proceeding" unless and until they are

---

[11] *See Bend Cable Communications, LLC d/b/a Bendbroadband Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 209 (MB 2007); *Cablevision Systems Corporation Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 220 (MB 2007); *Charter Communications, Inc. Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 8557 (MB 2007); *Colo Telephone Company et al.*, 22 FCC Rcd 13428 (MB 2007) (seven waivers); *Consolidated Requests for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 11780 (MB 2007) (122 waivers); *City of Crosslake, Minnesota d/b/a Crosslake Communications Petition for Deferral of Enforcement of July 1, 2007 Deadline in 47 C.F.R. § 76.1204(a)(1)*, 22 FCC Rcd 11754 (MB 2007); *GCI Cable, Inc. Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 8576 (MB 2007); *Great Plains Cable Television, Inc. et al. Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 13414 (MB 2007) (four waivers); *Guam Cablevision, LLC, Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 11747 (MB 2007); *Millennium Telcom, LLC d/b/a OneSource Communications Request for Waiver of Section 76.1204(a)(1) of the Commission's Rules*, 22 FCC Rcd 8567 (MB 2007).

appealed to the Commission. *Id.*; *Amor Family Broadcasting*, 918 F.2d at 962. Here, the Commission had no occasion to consider the Wireless Bureau's approval of earlier of bidding credit applications because none of those approvals had been appealed to it. *Id.* The Commission must establish "common law" before it can "abandon[]" it. Pet. Br. 37.

SNR and Northstar further complain that application of *Comcast* will allow the Commission "to cherry-pick Bureau precedent helpful to its desired outcome in any particular case, while disavowing any such precedent that even arguably stood in the way." *Id*. 40-41. But there is nothing illegitimate about the Commission exercising its power to decide which staff decisions it will follow, and which it will not, just as a court of appeals is free to affirm some district court decisions and reverse others. The Communications Act expressly preserves the Commission's right to "amend[]" or "rescind[]" the staff's "rule[s] or order[s]." 47 U.S.C. § 155(c)(1). SNR and Northstar also misapprehend *Comcast*'s purpose, which is to preserve the Commission's essential power to establish agency policy. *E.g.*, *Vernal Enterprises*, 355 F.3d at 661 ("staff error cannot bind an agency and force it, in effect, to continue such errors"). In the proceeding below, the Commission reasonably disavowed prior staff actions to the extent they "could be read to be

inconsistent with" its own interpretation of FCC rules and precedent. *Order* n.354 (JA___); *id.* n.365 (JA___).

We do not dispute the general proposition that "once an agency has adopted rules and regulations it must adhere to them so long as they remain in effect." Pet. Br. 36. However, the *agency's* rules and regulations are not established by staff action. None of the cases SNR and Northstar cite are to the contrary.

*New York State Energy Research and Developmental Authority v. FERC*, 746 F.2d 64 (D.C. Cir. 1984), concerned FERC's dismissal of an application late-filed under a new agency procedural rule. The court found that FERC's refusal to "invoke the proviso" in that rule authorizing "application of the [agency's] old rules in the interest of justice" was arbitrary and capricious where the applicant had demonstrated "substantial good-faith compliance" with the old rules. *Id.* at 68. The court "emphasize[d] that [its] conclusion [wa]s based on all of the nine circumstances presented in th[at] case" (only one of which concerned statements by FERC staff), and that "[its] holding rest[ed] upon the existence of [the] proviso" in the new rule, and not solely (or even largely) on staff action. *Id.* at 68-69.

*Orange Park Florida T.V., Inc. v. FCC*, 811 F.2d 664 (D.C. Cir. 1987) also is distinguishable. That decision vacated and remanded a Commission

40

order waiving a filing deadline based on a construction-permit applicant's purported confusion over "staff practice." *Id.* at 675. The court held the Commission "could reasonably" waive the filing deadline, but only if the applicant "had in fact relied on the practice or that such reliance was, under the circumstances, reasonable" – findings the agency failed to make. *Id.* The court did not hold the Commission was obligated to grant relief because of the staff's prior action. *Id.*[12]

Finally, SNR and Northstar argue the Commission's "failure" to distinguish terms in agreements filed with applications approved by Wireless Bureau staff "was arbitrary and capricious." Pet. Br. 41. Not so. This court has held "it [i]s not necessary for the FCC to address [the] non-binding decisions" of its staff. *Amor Family Broadcasting*, 918 F.2d at 962. Regardless, the Commission reasonably determined that it was under no obligation to distinguish the terms of non-public agreements attached to applications approved by staff without any written decision explaining the underlying rationale for the grants. *See* pp. 34-37, above.

---

[12] Nor can SNR and Northstar find support in *Doe v. Hampton*, 566 F.2d 265, 280-81 (D.C. Cir. 1977), and *Eastern Carolinas Broadcasting Company v. FCC*, 762 F.2d 95, 101 (D.C. Cir. 1985), because both decisions concerned the effect of the agency's own actions (not those of staff) on the rights of regulated parties.

### 4.   The Commission Did Not Apply New Rules Retroactively

SNR and Northstar argue that the Commission applied new rules retroactively to their applications when, in addition to examining the terms of the agreements between the two companies and DISH, it took into account the amount of their winning bids, DISH's unilateral right to choose SNR's and Northstar's network technology, and the parties' joint bidding behavior. Pet. Br. 41-47.  They are wrong.  An adjudicatory decision like the *Order* is not transformed into rulemaking because it applies an established standard to new circumstances.  *See, e.g.*, *Conference Group, LLC v. FCC*, 720 F.3d 957, 965 (D.C. Cir. 2013) (decision classifying service as "telecommunications" for the first time was adjudication not rulemaking); *AT&T v. FCC*, 454 F.3d 329, 333 (D.C. Cir. 2006) (same).  Here, the Commission applied its longstanding approach to evaluating control to the particular facts presented by the SNR and Northstar applications.  The *Order* "'is simply the latest application of th[at] approach.'"  *Conference Group*, 720 F.3d at 965 (quoting *AT&T*, 454 F.3d at 333).

**Bid amounts.** The Commission did not announce a new rule when it considered the unprecedented size of SNR's and Northstar's winning bids and the companies' resulting enormous indebtedness to DISH.  Pet. Br. 42.

SNR's and Northstar's gross winning bids (more than $13.3 billion combined) were comparable to the bids placed by the nation's two largest wireless providers (AT&T Wireless ($18,189,285,000) and Verizon Wireless ($10,430,017,000)), and far surpassed those of the next most successful designated entity, Advantage Spectrum L.P. ($451,072,000).  *See* Public Notice, 30 FCC Rcd 630 (2015).  They also dwarfed the bids of designated entities in every prior spectrum auction.  Before Auction 97, the largest total gross winning bid amount by a designated entity on spectrum eligible for bidding credits was $2,233,453,000.[13]  Given the circumstances, SNR's and Northstar's multibillion dollar bids were a relevant consideration under the Commission's totality-of-the-circumstances approach to determining control.  *See Fifth MO&O*, 10 FCC Rcd at 447, 456 (¶¶ 80, 96).  Employing that approach, the Commission had every right to question why DISH would make such a massive investment in two companies that had no staff, no facilities, and no track record providing wireless service if it did not intend to

---

[13] Those bids were placed by Salmon PCS, LLC in Auction 35.  *See* Public Notice, 16 FCC Rcd 2339 (WTB 2001).  The designated entity rules in effect during Auction 97 were originally adopted in 2006.  Since then, the largest total gross winning bid amount by a designated entity had been $400,638,000.  *See* Public Notice, 23 FCC Rcd 4572 (WTB 2008); Phoenix Center Am. Br. 19-20.

control and ultimately acquire their licenses.  *Order* ¶¶ 53-54, 84, 120

(JA___-___, ___, ___).

Concededly, the Commission by rule "recently imposed a new cap on

bidding credits for future auctions."  Pet. Br. 42; Phoenix Center Am. Br. 7,

16; *Updating Part 1 Competitive Bidding Rules*, 30 FCC Rcd 7493, 7539-47

(¶¶ 109-130) (2015).  That new cap does not mean that designated entities

were free to place multibillion-dollar bids without triggering Commission

scrutiny under the totality-of-the-circumstances approach before an explicit

cap was adopted.

*Interoperability restrictions.*  SNR and Northstar contend that the

Commission in effect adopted a new rule limiting designated entities to

interoperability commitments with existing wireless providers.  Pet. Br. 42-

44.  They assert that the Commission applied this rule to find that they were

not in control of their licenses because they committed to use any technology

DISH selects in the future.  *Id.*

SNR and Northstar have never explained why they ceded their

technology selection to DISH.  Notwithstanding DISH's lack of an existing

network, DISH could have identified a technology, or limited the

interoperability commitment to a range of technologies, prior to investing in

SNR and Northstar.  Instead, SNR and Northstar agreed to interoperate with a

44

network yet to be built and a technology yet to be chosen.  *Order* ¶¶ 96-97

(JA___-___).  The Commission reasonably found this gave DISH "*de facto*

control over" SNR's and Northstar's "network technology" and "services."

*Id.* ¶ 97 (JA___).

    To be sure, the Commission distinguished interoperability

commitments with existing wireless providers with existing networks from

SNR's and Northstar's interoperability commitments with DISH.  *Order* ¶ 97

(JA___).  The Commission explained that where the investor has an

operational network, a designated entity knows the technology required to

interoperate before entering into a relationship with the investor.  *Id.*  The

critical distinction the Commission made was that the designated entity in

that circumstance has made an informed choice, which SNR and Northstar

could not have done here.

    ***Joint Bidding Behavior.***  SNR and Northstar argue the Commission

applied a new rule prohibiting designated entities from entering into joint

bidding arrangements when it "deem[ed]" their "joint bidding behavior to be

evidence of *de facto* control."  Pet. Br. 47.  That overstates the *Order*'s

findings.  The Commission did not hold that SNR and Northstar could not

engage in joint bidding under the rules in place during Auction 97.  It held

only that the specific bidding behavior in which they engaged "corroborate[d

45

its] determination" that DISH has *de facto* control of SNR and Northstar. *Order* ¶ 5 (JA___); *id.* ¶¶ 109-114, 120 (JA___-___, ___).

SNR and Northstar complain that if the Commission "thought this behavior problematic, it could have said so before the auction." Pet. Br. 46; Phoenix Center Am. Br 5-6, 24-25. But the Commission could not have anticipated SNR and Northstar would, *inter alia*, use the same initial list of "target" licenses and place an extensive series of identical bids for the same licenses. *Order* ¶¶ 111-114 (JA ___-___). Nor was there any reason for the Commission to "stop or delay" the auction because of the joint bidding conduct, as SNR and Northstar suggest. Pet. Br. 46. That conduct only called into question the companies' eligibility for bidding credits, not their eligibility for licenses. *Order* ¶¶ 129-136 (JA___-___).

The Commission likewise would have departed from its own rules and policies had it denied SNR and Northstar bidding credits based on their short-form applications. Phoenix Center Am. Br. 21-23. Prior to an auction, staff review of bidding credit eligibility is limited to whether an applicant qualifies as a small or very small business based on its self-reported revenues and those of the attributable interest holders it discloses. *Auction Procedures Public Notice* at Attachment D, Section I.C.4.d. ("Bidding Credit Revenue Information") (JA___). Bidding credits are granted on the basis of long-form

46

applications filed after the auction has closed. *Id.* ¶ 231 (JA___); 47 C.F.R.
§ 1.2112(b)(2). That is when the Commission engages in the public interest
review required for grant of an application for a spectrum license, 47 U.S.C.
§ 309(a), and when designated entity applicants who are winning bidders
accordingly "submit all agreements and information that support [their]
eligibility as a small business." *Order* ¶ 51 (JA___); 47 C.F.R.
§ 1.2112(b)(2). Even when there are allegations an auction participant's
short-form application misrepresents its designated entity eligibility, the
agency defers final judgment to post-auction review of its long-form
application. *See Steven R. Sixberry*, 15 FCC Rcd 15958 (WTB 2000). This
Court has found that "deferring grantability determinations until after an
auction" is reasonable because it allows the agency to "forego consideration
of the unsuccessful applicants." *Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1, 10
(D.C. Cir. 2009).

Finally, there is no merit to SNR's and Northstar's assertion that their
joint bidding behavior was similar to that in prior auctions. Pet. Br. 46 &
n.30. While Cricket held non-controlling interests in two designated entity
applicants in Auction 58 – Alaska Native Wireless Broadband 1 Licensee,
LLC and Alaska Native Wireless Broadband 2 Licensee, LLC – the latter
never placed any bids. *Order* n.330 (JA___); Letter from Bennett L. Ross,

Counsel for VTel Wireless, Inc., to Jean Kiddoo, Deputy Bureau Chief,

Wireless Telecommunications Bureau, FCC (August 4, 2015) at 9 (JA___).

In contrast, DISH holds majority equity interests in SNR and Northstar, both

of which bid on and won hundreds of licenses in Auction 97. *Order* ¶¶ 3, 14,

17, 22 (JA ___, ___, ___, ___).

Verizon's joint bidding arrangement with Vista in Auction 58 is even

less analogous – it involved only one designated entity applicant. Pet. Br.

n.30. And as SNR and Northstar concede, Vista, "due to its 'entrepreneur'

status, was deemed eligible to bid on certain licenses not made available to

larger entities" like Verizon. *Id.* Hence, Vista and Verizon bid on separate

groups of licenses, unlike SNR and Northstar, which placed identical bids for

the same licenses. *Order* ¶¶ 111-113 (JA___-___).

Likewise, the examples of joint bidding in Auction 35 can be

distinguished on the ground they involved one designated entity, not two.

Pet. Br. n.30. In the proceeding below, it was "[t]he existence of two

[designated entity] [a]pplicants" and their identical bidding that contributed to

the Commission's *de facto* control finding. *Order* ¶ 113 (JA ___). As the

Commission explained, SNR's and Northstar's joint bidding behavior

"demonstrate[d]" they "were not acting in their own individual interests but

were acting with a common goal of securing the same list of licenses for

48

DISH's benefit, without importance to which company ended up with any particular license."  *Id.*; *id.* ¶ 112 (JA___).

    ***Commissioner Statements***.  SNR's and Northstar's retroactivity argument is not advanced by FCC Chairman Wheeler's statement that the *Order* "used a totality of circumstances test that had never been applied before."  Pet. Br. 20-21, 42; *see* Phoenix Center Am. Br. 6-7, 17, 20, 28-29 (discussing congressional testimony by Chairman Wheeler and Commissioner Pai).  That statement is not a concession that the *Order* retroactively applied new rules, only an acknowledgement that it represented the Commission's first application in the designated entity context of the long-established totality-of-the-circumstances approach to determining control.  Regardless, "'[a]gency opinions, like judicial opinions, speak for themselves,'" and as we have explained, SNR's and Northstar's retroactivity argument finds no support in the *Order*.  *PLMRS Narrowband v. FCC*, 182 F.3d 995, 1001 (D.C. Cir. 1999) (quoting *Checkosky v. SEC*, 23 F.3d 452, 489 (D.C. Cir. 1994)).

### B.  The Commission Reasonably Found Management and Other Agreements Gave DISH a Controlling Interest in SNR and Northstar

    As a "separate and independent legal basis" for its decision, the Commission found the Management Services Agreements SNR and Northstar

entered into with DISH, "in combination with the interoperability

requirements" in other agreements, gave DISH "'authority to make decisions

or otherwise engage in practices or activities that determine, or significantly

influence … [t]he nature and types of services offered by'" SNR and

Northstar. *Order* ¶ 123 (JA___) (quoting 47 C.F.R. § 1.2110(c)(2)(ii)(H)); *id.*

¶¶ 8, 124-128 (JA ___, ___-___).

SNR and Northstar contend that the Commission never indicated that

Section 1.2110(c)(2)(ii)(H) of its rules "has independent meaning from its

control standard." Pet. Br. 48. This contention is unsupported by the text and

structure of the Commission's rules: The affiliate control standard is codified

in Section 1.2110(c)(5) of the Commission's rules, 47 C.F.R. § 1.2110(c)(5);

the management authority rule is separately codified in Section

1.2110(c)(2)(ii)(H), 47 C.F.R. § 1.2110(c)(2)(ii)(H). SNR and Northstar thus

had ample notice that management agreements would be evaluated under

subsection (c)(2)(ii)(H).

SNR and Northstar also assert that the Commission's analysis in "[t]his

part of the Order merely rehashes the same concerns … about

interoperability." Pet. Br. 48. In fact, the Commission's analysis under Rule

1.2110(c)(2)(ii)(H) relied primarily on DISH's provision of "key functions

directly relevant to the nature and types of services" SNR and Northstar can

offer, including "engineering and construction of the network," "billing and collection services", and "marketing, sales, advertising, and promotion." *Order* ¶ 123 (JA___).  Other agreements that "limit[ed] substantially the ability of [SNR and Northstar] to retain personnel to provide [those] functions" strengthened the Commission's finding that the Management Services Agreements provided DISH a controlling interest in each company. *Id.*

The Commission's "conclusion [wa]s reinforced by" the "interoperability requirements" in SNR's and Northstar's agreements with DISH.  *Id.* ¶ 125 (JA___).  "[U]ntil DISH determines the technology [it] will use," the Commission explained, "SNR and Northstar cannot determine 'the nature and type of services' that they will provide."  *Id.* (quoting 47 C.F.R. § 1.2110(c)(2)(ii)(H)).  The Commission, however, found no merit in SNR's and Northstar's argument that "[a]n investor's choice of system technology has the same effect … whether or not it already has deployed a system."  Pet. Br. 49.  The Commission explained that where an investor already has an operating wireless network, the designated entity "[i]s clearly making a technology and network choice" when it "enter[s] into" an interoperability arrangement with the investor.  *Order* ¶ 126 (JA___).  Because DISH has no

51

network, the Commission found SNR and Northstar ceded their own choices

to DISH.  *Id.* ¶¶ 125, 127 (JA___, ___).

## II.    SNR AND NORTHSTAR HAD FAIR NOTICE OF THE COMMISSION'S CONTROL STANDARD

SNR and Northstar had ample notice of the standard the Commission

employed to evaluate their relationships with DISH.  Indeed, SNR and

Northstar "received, or should have received, notice of the agency's

interpretation in the most obvious way of all:  by reading the regulations."

*General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).

To provide guidance on the Commission's control rules, the Wireless

Bureau prior to Auction 97 issued a Public Notice directing potential bidders

to relevant FCC rules and published decisions.  *See* p. 29, above.  After

reviewing the rules and policies referenced in that Public Notice, as well as

the agency's other published decisions concerning control issues, SNR and

Northstar were apprised of the criteria the Commission would use to evaluate

their relationships with DISH.  *Id*. 29-32.  This Court in *Star Wireless v.*

*FCC*, 522 F.3d 469, 474 (D.C. Cir. 2008), found that a similar pre-auction

Public Notice placed "the regulated community … on notice regarding the

relevant scope of the [FCC's] anti-collusion rule."  *See also ICO Global*

*Comm'cns Holdings v. FCC*, 428 F.3d 264 (D.C. Cir. 2005) (FCC precedent

gave appellants adequate notice of how to comply with requirements attached to their licenses).

Thus, this case is unlike the cases discussed at pages 50-53 of the SNR-Northstar brief, where a regulated entity and an agency had different but reasonable interpretations of the same rule or regulation. SNR's and Northstar's interpretation of FCC rules and policies is unreasonable. It is not founded on agency precedent, but only on staff adjudicatory actions unaccompanied by any discussion or explanation, and it wrongly assumes that a contract term has the same effect in the context of different agreements. *See* pp. 32-37, above. Where, as here, "the agency's interpretation is the most natural one," this Court "ha[s] never applied the fair notice doctrine." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 123 (D.C. Cir. 2008).

*FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012), is even further afield. In *Fox*, the Court found that "the Commission policy in place at the time" of the challenged television broadcasts "gave no notice" to broadcasters that "fleeting expletives and a brief moment of indecency were actionably indecent." *Id*. at 2318 (noting, in addition, the importance of notice involving "regulations that touch upon 'sensitive areas of basic First Amendment freedoms'"). The discussion of unpublished staff letters in the Court's decision was not used to set forth the Commission's policy, but to

rebut the government's claim that broadcasters would otherwise have been on notice of what was required. *Id.* at 2319 (the letters "show … that the Government can point to nothing that would have given ABC affirmative notice that its broadcast would be considered actionably indecent"). By contrast, SNR and Northstar seek to rely on staff actions, otherwise unexplained, to support their view of the *Commission's* policy.

## III.  THE COMMISSION REASONABLY REFUSED TO NEGOTIATE BIDDING CREDIT ELIGIBILITY WITH SNR AND NORTHSTAR

Finally, SNR and Northstar contend that the Commission failed to "follow its established practice" of allowing winning bidders to "amend their agreements to respond to Bureau concerns regarding control." Pet. Br. 57-58. But SNR's and Northstar's argument relies exclusively on *staff* actions the Commission was not bound to follow or distinguish. *Comcast*, 526 F.3d at 770; *Amor Family Broadcasting*, 918 F.2d at 962. Unlike *Radio Athens*, Pet. Br. 58-60, SNR and Northstar cannot show noncompliance with "the *Commission*'s usual procedure for dealing with a [control] problem." *Radio Athens*, *Inc. (WATH) v. FCC*, 401 F.2d 398, 403 (D.C. Cir. 1968) (emphasis added).

The Commission itself has "broad procedural authority" to "'fashion [its] own rules of procedure.'" *FCC v. Schreiber*, 381 U.S. 279, 290 (1965)

(quoting *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 143 (1940)); 47 U.S.C. § 154(j). Exercising that authority here, it found that allowing SNR and Northstar to amend their long-form applications would undermine the incentive for other applicants to comply with the designated entity rules "in the first instance." *Order* n.431 (JA___).

The Commission also found this was not a case where an amendment would merely clarify "the clear intent of the parties." *Id.* (quoting *ClearCom L.P.*, 16 FCC Rcd 18627, 18643 (¶¶ 26-27) (WTB 2001)). FCC rules provide that an auction application subject to a "major amendment" will be considered "newly filed," which in effect dismisses the original application. 47 C.F.R. §§ 1.927(h), 1.929(a); 1.2105(b)(2). "Major amendments" include "any substantial change in ownership or control" of the applicant. *Id.* § 1.929(a)(2); *id.* § 1.2105(b)(2); *Two Way Radio of Carolina, Inc.*, 14 FCC Rcd 12035, 12039 (¶ 8) (1999) ("modification of an applicant's small business status does not constitute a minor change under [the FCC's] competitive bidding rules"). To address the Commission's *de facto* control finding, which was based in substantial part on the combined effect of dozens of provisions in SNR's and Northstar's agreements with DISH, the parties would have had file amendments reflecting a major restructuring of their relationships. Under the circumstances, it was reasonable for the

Commission to deny SNR and Northstar the opportunity to file amendments that otherwise would have resulted in dismissal of their applications.  *See* 47 C.F.R. §§ 1.927(h), 1.2105(b)(2).  Further, those amendments could not have addressed the additional factors outside their agreements that contributed to the Commission's *de facto* control finding, such as SNR's and Northstar's joint bidding behavior in Auction 97.  *Order* ¶ 120 (JA___); *see Trompex Corp.*, 18 FCC Rcd 3286, 3292 (¶ 14) (WTB 2003) (where "there was nothing" that "would have remedied [petitioners'] errors", the agency did not violate their due process rights by "not advis[ing] them of any further filings or information needed by the Commission").

"[I]n the circumstances of this case," therefore, the Commission reasonably found "no basis" to provide SNR and Northstar another opportunity to demonstrate their eligibility for very small business bidding credits.  *Order* n.431; *Vernal Enterprises*, 355 F.3d at 661.

56

## CONCLUSION

The petitions for review should be denied and the appeals dismissed.

Respectfully submitted,

WILLIAM J. BAER                       JONATHAN B. SALLET
ASSISTANT ATTORNEY GENERAL            GENERAL COUNSEL

ROBERT B. NICHOLSON                   JACOB M. LEWIS
ROBERT J. WIGGERS                     ASSOCIATE GENERAL COUNSEL
ATTORNEYS
                                      /s/ Maureen K. Flood
UNITED STATES
   DEPARTMENT OF JUSTICE              MAUREEN K. FLOOD
WASHINGTON, D.C. 20530                COUNSEL

                                      FEDERAL COMMUNICATIONS
                                         COMMISSION
                                      WASHINGTON, D.C. 20554
                                      (202) 418-1740

February 26, 2016

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| SNR WIRELESS LICENSECO, LLC, ET AL., <br><br> PETITIONERS, <br><br> v. <br><br> FEDERAL COMMUNICATIONS COMMISSION <br> AND UNITED STATES OF AMERICA, <br><br> RESPONDENTS. | NOS. 15-1330, 15-1331, 15-1332, 15-1333 |

CERTIFICATE OF COMPLIANCE

Pursuant to the requirements of Fed. R. App. P. 32(a)(7), I hereby certify that the accompanying Brief for Respondents in the captioned case contains 11,783 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times Roman font.

*/s/ Maureen K. Flood*

Maureen K. Flood
Counsel
Federal Communications Commission
Washington, D.C.  20554
(202) 418-1740 (Telephone)
(202) 418-2819 (Fax)

February 26, 2016

# Attachment A



FCC Home | Search | Updates | E-Filing | Initiatives | For Consumers | Find People

## Universal Licensing System

FCC > WTB > ULS > Online Systems > Application Search                                                          FCC Site Map

AWS (1710-1755 MHz and 2110-2155 MHz) - 0002774595 - Denali Spectrum License, LLC

### Administration                                                                                            ? HELP

🔍 New Search   🔍 Refine Search   ⮐ Return to Results   🖨 Printable Page   🗐 Reference Copy

| MAIN | ADMIN | TRANS LOG | MARKET | AGREEMENTS | REVENUE |
|------|-------|-----------|--------|------------|---------|

| | | | |
|---|---|---|---|
| File Number | 0002774595 | Radio Service | AW - AWS (1710-1755 MHz and 2110-2155 MHz) |
| Call Sign | | Application Status | G - Granted |
| **General Information** | | | |
| Mode | Interactive | PFR Status | |
| VEC/Coordinator/COLEM | | | |
| Auction ID | 66 - AWS-1 | Source | |
| Change Type | Minor | Overall Change Type | Minor |
| | | | |
| **Signature** | | | |
| Signature Information | Allen M Todd | Title | Asst. Sec. of Mgr of Mgr of Mgr |
| | | | |

| **Comments** | |
|---|---|
| Description | Date |
| Application appeared on Public Notice, DA 07-1953, released April 30, 2007 as granted. | 04/30/2007 |
| Application appeared on Public Notice, DA 06-2179, released October 27, 2006 as Accepted For Filing. | 10/27/2006 |

| **History** | |
|---|---|
| Date | Event |
| 04/30/2007 | Application Granted |
| 04/30/2007 | Redlight Review Completed |
| 04/30/2007 | Action PN Generated |

# Statutory and Regulatory Addendum

## Table of Contents

5 U.S.C. § 552 .................................................................................................. 2

5 U.S.C. § 706 .................................................................................................. 4

47 U.S.C. § 154 ................................................................................................ 5

47 U.S.C. § 155 ................................................................................................ 6

47 U.S.C. § 309 ................................................................................................ 7

47 C.F.R. § 0.445 ........................................................................................... 11

47 C.F.R. § 1.927 ........................................................................................... 12

47 C.F.R. § 1.929 ........................................................................................... 13

47 C.F.R. § 1.2104 ......................................................................................... 14

47 C.F.R. § 1.2105 ......................................................................................... 16

47 C.F.R. § 1.2110 ......................................................................................... 17

47 C.F.R. § 1.2111 ......................................................................................... 25

47 C.F.R. § 1.2112 ......................................................................................... 26

## 5 U.S.C. § 552

**United States Code Annotated**
**Title 5. Government Organization and Employees**
**Part I. The Agencies Generally**
**Chapter 5. Administrative Procedure**
**Subchapter II. Administrative Procedure**

### § 552  Public information; agency rules, opinions, orders, records, and proceedings

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed

published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

(C) administrative staff manuals and instructions to staff that affect a member of the public;

(D) copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; and

(E) a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection and copying current indexes providing identifying information for the public as

3

to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if—

(i) it has been indexed and either made available or published as provided by this paragraph; or

(ii) the party has actual and timely notice of the terms thereof.

\*       \*       \*       \*       \*

### 5 U.S.C. § 706

**United States Code Annotated**
**Title 5. Government Organization and Employees**
**Part I. The Agencies Generally**
**Chapter 7. Judicial Review**

### § 706  Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

4

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 47 U.S.C. § 154

### United States Code Annotated
### Title 47. Telecommunications
### Chapter 5. Wire or Radio Communication
### Subchapter I. General Provisions

## § 154   Federal Communications Commission

*       *       *       *       *

(j) Conduct of proceedings; hearings

The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice. No commissioner shall participate in any hearing or proceeding in which he has a pecuniary interest. Any party may appear before the Commission and be heard in person or by attorney. Every vote and official act of the Commission shall be entered of record, and its proceedings shall be public upon the request of any party interested. The Commission is authorized to withhold publication of records or proceedings containing secret information affecting the national defense.

*    *    *    *    *

**47 U.S.C. § 155**

**United States Code Annotated
Title 47. Telecommunications
Chapter 5. Wire or Radio Communication
Subchapter I. General Provisions**

**5 U.S.C. § 155  Commission**

*    *    *    *    *

(c) Delegation of functions; exceptions to initial orders; force, effect and enforcement of orders; administrative and judicial review; qualifications and compensation of delegates; assignment of cases; separation of review and investigative or prosecuting functions; secretary; seal

(1) When necessary to the proper functioning of the Commission and the prompt and orderly conduct of its business, the Commission may, by published rule or by order, delegate any of its functions (except functions granted to the Commission by this paragraph and by paragraphs (4), (5), and (6) of this subsection and except any action referred to in sections 204(a)(2), 208(b), and 405(b) of this title) to a panel of commissioners, an individual commissioner, an employee board, or an individual employee, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter; except that in delegating review functions to employees in cases of adjudication (as defined in section 551 of Title 5), the delegation in any such case may be

6

made only to an employee board consisting of two or more employees referred to in paragraph (8) of this subsection. Any such rule or order may be adopted, amended, or rescinded only by a vote of a majority of the members of the Commission then holding office. Except for cases involving the authorization of service in the instructional television fixed service, or as otherwise provided in this chapter, nothing in this paragraph shall authorize the Commission to provide for the conduct, by any person or persons other than persons referred to in paragraph (2) or (3) of section 556(b) of Title 5, of any hearing to which such section applies.

*    *    *    *    *

## 47 U.S.C. § 309

**United States Code Annotated**
**Title 47. Telecommunications**
**Chapter 5. Wire or Radio Communication**
**Subchapter III. Special Provisions Relating to Radio**
**Part I. General Provisions**

### § 309 Application for license

(a) Considerations in granting application

Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

*    *    *    *    *

(j) Use of competitive bidding

7

(1) General authority

If, consistent with the obligations described in paragraph (6)(E), mutually exclusive applications are accepted for any initial license or construction permit, then, except as provided in paragraph (2), the Commission shall grant the license or permit to a qualified applicant through a system of competitive bidding that meets the requirements of this subsection.

(2) Exemptions

The competitive bidding authority granted by this subsection shall not apply to licenses or construction permits issued by the Commission—

(A) for public safety radio services, including private internal radio services used by State and local governments and non-government entities and including emergency road services provided by not-for-profit organizations, that—

(i) are used to protect the safety of life, health, or property; and

(ii) are not made commercially available to the public;

(B) for initial licenses or construction permits for digital television service given to existing terrestrial broadcast licensees to replace their analog television service licenses; or

(C) for stations described in section 397(6) of this title.

(3) Design of systems of competitive bidding

For each class of licenses or permits that the Commission grants through the use of a competitive bidding system, the Commission shall, by regulation, establish a competitive bidding methodology. The Commission shall seek to design and test multiple alternative methodologies under appropriate circumstances. The Commission shall, directly or by contract, provide for the design and conduct (for purposes of testing) of competitive bidding using a contingent combinatorial bidding system that permits prospective bidders to bid on combinations or groups of licenses in a single bid and to enter multiple alternative bids within a single bidding round. In identifying classes of licenses and permits to be issued by competitive bidding, in specifying

eligibility and other characteristics of such licenses and permits, and in designing the methodologies for use under this subsection, the Commission shall include safeguards to protect the public interest in the use of the spectrum and shall seek to promote the purposes specified in section 151 of this title and the following objectives:

(A) the development and rapid deployment of new technologies, products, and services for the benefit of the public, including those residing in rural areas, without administrative or judicial delays;

(B) promoting economic opportunity and competition and ensuring that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women;

(C) recovery for the public of a portion of the value of the public spectrum resource made available for commercial use and avoidance of unjust enrichment through the methods employed to award uses of that resource;

(D) efficient and intensive use of the electromagnetic spectrum;

(E) ensure that, in the scheduling of any competitive bidding under this subsection, an adequate period is allowed-

(i) before issuance of bidding rules, to permit notice and comment on proposed auction procedures; and

(ii) after issuance of bidding rules, to ensure that interested parties have a sufficient time to develop business plans, assess market conditions, and evaluate the availability of equipment for the relevant services; and

(F) for any auction of eligible frequencies described in section 923(g)(2) of this title, the recovery of 110 percent of estimated relocation or sharing costs as provided to the Commission pursuant to section 923(g)(4) of this title.

(4) Contents of regulations

In prescribing regulations pursuant to paragraph (3), the Commission shall--

(A) consider alternative payment schedules and methods of calculation, including lump sums or guaranteed installment payments, with or without royalty payments, or other schedules or methods that promote the objectives described in paragraph (3)(B), and combinations of such schedules and methods;

(B) include performance requirements, such as appropriate deadlines and penalties for performance failures, to ensure prompt delivery of service to rural areas, to prevent stockpiling or warehousing of spectrum by licensees or permittees, and to promote investment in and rapid deployment of new technologies and services;

(C) consistent with the public interest, convenience, and necessity, the purposes of this chapter, and the characteristics of the proposed service, prescribe area designations and bandwidth assignments that promote (i) an equitable distribution of licenses and services among geographic areas, (ii) economic opportunity for a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women, and (iii) investment in and rapid deployment of new technologies and services;

(D) ensure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women are given the opportunity to participate in the provision of spectrum-based services, and, for such purposes, consider the use of tax certificates, bidding preferences, and other procedures;

(E) require such transfer disclosures and antitrafficking restrictions and payment schedules as may be necessary to prevent unjust enrichment as a result of the methods employed to issue licenses and permits; and

(F) prescribe methods by which a reasonable reserve price will be required, or a minimum bid will be established, to obtain any license or permit being assigned pursuant to the competitive bidding, unless the Commission determines that such a reserve price or minimum bid is not in the public interest.

*     *     *     *     *

**47 C.F.R. § 0.445**

**Code of Federal Regulations**
**Title 47. Telecommunication**
**Chapter I. Federal Communications Commission**
**Subchapter A. General**
**Part 0. Commission Organization**
**Subpart C. General Information**
**Public Information and Inspection of Records**

**§ 0.445   Publication, availability and use of opinions, orders, policy statements, interpretations, administrative manuals, and staff instructions.**

(a) Adjudicatory opinions and orders of the Commission, or its staff acting on delegated authority, are mailed or delivered by electronic means to the parties, and as part of the record, are available for inspection in accordance with §§ 0.453 and 0.455.

(b) Texts adopted by the Commission or a member of its staff on delegated authority and released through the Office of Media Relations are published in the FCC Record. Older materials of this nature are available in the FCC Reports. In the event that such older materials are not published in the FCC Reports, reference should be made to the Federal Register or Pike and Fischer Communications Regulation.

(c) All rulemaking documents or summaries thereof are published in the Federal Register and are available on the Commission's Web site. The complete text of the Commission decision also is released by the Commission and is available for inspection and copying during normal business hours in the Office of Media Relations, the Reference Information Center, via the Electronic Comment Filing System (ECFS), or as otherwise specified in the rulemaking document published in the Federal Register. The complete texts of rulemaking decisions may also be purchased from the Commission's copy contractor.

(d) Formal policy statements and interpretations designed to have general applicability are published in the Federal Register, the FCC Record, FCC Reports, or Pike and Fischer Communications Regulation. Commission decisions and other Commission documents not entitled formal policy

11

statements or interpretations may contain substantive interpretations and statements regarding policy, and these are published as part of the document in the FCC Record, FCC Reports or Pike and Fischer Communications Regulation. General statements regarding policy and interpretations furnished to individuals, in correspondence or otherwise, are not ordinarily published.

(e) If the documents described in paragraphs (a) through (d) of this section are published in the Federal Register, the FCC Record, FCC Reports, or Pike and Fischer Communications Regulation, they are indexed, and they may be relied upon, used or cited as precedent by the Commission or private parties in any manner. If they are not so published, they may not be relied upon, used or cited as precedent, except against persons who have actual notice of the document in question or by such persons against the Commission. No person is expected to comply with any requirement or policy of the Commission unless he or she has actual notice of that requirement or policy or a document stating it has been published as provided in this paragraph. Nothing in this paragraph, however, shall be construed as precluding a reference to a recent document that is pending publication.

*    *    *    *    *

**47 C.F.R. § 1.927**

**Code of Federal Regulations**
**Title 47. Telecommunication**
**Chapter I. Federal Communications Commission**
**Subchapter A. General**
**Part 1. Practice and Procedure**
**Subpart F. Wireless Radio Services Applications and Proceedings**
**Application Requirements and Procedures**

**§ 1.927  Amendment of applications.**

*    *    *    *    *

(h) Where an amendment to an application constitutes a major change, as defined in § 1.929, the amendment shall be treated as a new application for determination of filing date, public notice, and petition to deny purposes.

*       *       *       *       *


## 47 C.F.R. § 1.929

**Code of Federal Regulations
Title 47. Telecommunication
Chapter I. Federal Communications Commission
Subchapter A. General
Part 1. Practice and Procedure
Subpart F. Wireless Radio Services Applications and Proceedings
Application Requirements and Procedures**

### § 1.929  Classification of filings as major or minor.

Applications and amendments to applications for stations in the wireless radio services are classified as major or minor ( see § 1.947). Categories of major and minor filings are listed in § 309 of the Communications Act of 1934.

(a) For all stations in all Wireless Radio Services, whether licensed geographically or on a site-specific basis, the following actions are classified as major:

*       *       *       *       *

(2) Any substantial change in ownership or control, including requests for partitioning and disaggregation;

*       *       *       *       *

13

## 47 C.F.R. § 1.2104

**Code of Federal Regulations
Title 47. Telecommunication
Chapter I. Federal Communications Commission
Subchapter A. General
Part 1. Practice and Procedure
Subpart Q. Competitive Bidding Proceedings
General Procedures**

### § 1.2104  Competitive bidding mechanisms.

\*     \*     \*     \*     \*

(g) Withdrawal, Default and Disqualification Payment. As specified below, when the Commission conducts an auction pursuant to § 1.2103, the Commission will impose payments on bidders who withdraw high bids during the course of an auction, or who default on payments due after an auction closes or who are disqualified.

(1) Bid withdrawal prior to close of auction. A bidder that withdraws a bid during the course of an auction is subject to a withdrawal payment equal to the difference between the amount of the withdrawn bid and the amount of the winning bid in the same or subsequent auction(s). In the event that a bidding credit applies to any of the bids, the bid withdrawal payment is either the difference between the net withdrawn bid and the subsequent net winning bid, or the difference between the gross withdrawn bid and the subsequent gross winning bid, whichever is less. No withdrawal payment will be assessed for a withdrawn bid if either the subsequent winning bid or any of the intervening subsequent withdrawn bids equals or exceeds that withdrawn bid. The withdrawal payment amount is deducted from any upfront payments or down payments that the withdrawing bidder has deposited with the Commission. In the case of multiple bid withdrawals on a single license, the payment for each bid withdrawal will be calculated based on the sequence of bid withdrawals and the amounts withdrawn in the same or subsequent auction(s). In the event that a license for which there have been withdrawn bids subject to withdrawal payments is not won in the same auction, those bidders for which a final withdrawal payment cannot be calculated will be assessed an interim bid withdrawal payment of between 3 and 20 percent of their withdrawn bids, according to a percentage (or

14

percentages) established by the Commission in advance of the auction. The interim bid withdrawal payment will be applied toward any final bid withdrawal payment that will be assessed at the close of a subsequent auction of the corresponding license.

*      *      *      *      *

(2) Default or disqualification after close of auction. A bidder assumes a binding obligation to pay its full bid amount upon acceptance of the winning bid at the close of an auction. If a bidder defaults or is disqualified after the close of such an auction, the defaulting bidder will be subject to a default payment consisting of a deficiency payment, described in § 1.2104(g)(2)(i), and an additional payment, described in § 1.2104(g)(2)(ii) and (g)(2)(iii). The default payment will be deducted from any upfront payments or down payments that the defaulting bidder has deposited with the Commission.

(i) Deficiency payment. The deficiency payment will equal the difference between the amount of the defaulted bid and the amount of the winning bid in a subsequent auction, so long as there have been no intervening withdrawn bids that equal or exceed the defaulted bid or the subsequent winning bid. If the subsequent winning bid or any intervening subsequent withdrawn bid equals or exceeds the defaulted bid, no deficiency payment will be assessed. If there have been intervening subsequent withdrawn bids that are lower than the defaulted bid and higher than the subsequent winning bid, but no intervening withdrawn bids that equal or exceed the defaulted bid, the deficiency payment will equal the difference between the amount of the defaulted bid and the amount of the highest intervening subsequent withdrawn bid. In the event that a bidding credit applies to any of the applicable bids, the deficiency payment will be based solely on net bids or solely on gross bids, whichever results in a lower payment.

(ii) Additional payment—applicable percentage. When the default or disqualification follows an auction without combinatorial bidding, the additional payment will equal between 3 and 20 percent of the applicable bid, according to a percentage (or percentages) established by the Commission in advance of the auction. When the default or disqualification follows an auction with combinatorial bidding, the additional payment will equal 25 percent of the applicable bid.

15

(iii) Additional payment—applicable bid. When no deficiency payment is assessed, the applicable bid will be the net amount of the defaulted bid. When a deficiency payment is assessed, the applicable bid will be the subsequent winning bid, using the same basis—i.e., net or gross—as was used in calculating the deficiency payment.

\*       \*       \*       \*       \*

**47 C.F.R. § 1.2105**

**Code of Federal Regulations**
**Title 47. Telecommunication**
**Chapter I. Federal Communications Commission**
**Subchapter A. General**
**Part 1. Practice and Procedure**
**Subpart Q. Competitive Bidding Proceedings**
**General Procedures**

**§ 1.2105  Bidding application and certification procedures; prohibition of certain communications.**

\*       \*       \*       \*       \*

(b) Modification and Dismissal of Short–Form Application (FCC Form 175).

\*       \*       \*       \*       \*

(2) The Commission will provide bidders a limited opportunity to cure defects specified herein (except for failure to sign the application and to make certifications) and to resubmit a corrected application. During the resubmission period for curing defects, a short-form application may be amended or modified to cure defects identified by the Commission or to make minor amendments or modifications. After the resubmission period has ended, a short-form application may be amended or modified to make minor changes or correct minor errors in the application. Major amendments cannot be made to a short-form application after the initial filing deadline. Major amendments include changes in ownership of the applicant that would

16

constitute an assignment or transfer of control, changes in an applicant's size which would affect eligibility for designated entity provisions, and changes in the license service areas identified on the short-form application on which the applicant intends to bid. Minor amendments include, but are not limited to, the correction of typographical errors and other minor defects not identified as major. An application will be considered to be newly filed if it is amended by a major amendment and may not be resubmitted after applicable filing deadlines.

\*        \*        \*        \*        \*

## 47 C.F.R. § 1.2110

**Code of Federal Regulations**
**Title 47. Telecommunication**
**Chapter I. Federal Communications Commission**
**Subchapter A. General**
**Part 1. Practice and Procedure**
**Subpart Q. Competitive Bidding Proceedings**
**General Procedures**

## § 1.2110  Designated entities.

\*        \*        \*        \*        \*

(a) Designated entities are small businesses (including businesses owned by members of minority groups and/or women), rural telephone companies, and eligible rural service providers.

(b) Eligibility for small business and entrepreneur provisions—

(1) Size attribution.

(i) The gross revenues of the applicant (or licensee), its affiliates, its controlling interests, and the affiliates of its controlling interests shall be attributed to the applicant (or licensee) and considered on a cumulative basis and aggregated for purposes of determining whether the applicant (or licensee) is eligible for status as a small business, very small business, or

entrepreneur, as those terms are defined in the service-specific rules. An applicant seeking status as a small business, very small business, or entrepreneur, as those terms are defined in the service-specific rules, must disclose on its short- and long-form applications, separately and in the aggregate, the gross revenues for each of the previous three years of the applicant (or licensee), its affiliates, its controlling interests, and the affiliates of its controlling interests.

(ii) If applicable, pursuant to § 24.709 of this chapter, the total assets of the applicant (or licensee), its affiliates, its controlling interests, and the affiliates of its controlling interests shall be attributed to the applicant (or licensee) and considered on a cumulative basis and aggregated for purposes of determining whether the applicant (or licensee) is eligible for status as an entrepreneur. An applicant seeking status as an entrepreneur must disclose on its short- and long-form applications, separately and in the aggregate, the gross revenues for each of the previous two years of the applicant (or licensee), its affiliates, its controlling interests, and the affiliates of its controlling interests.

(2) Aggregation of affiliate interests. Persons or entities that hold interests in an applicant (or licensee) that are affiliates of each other or have an identity of interests identified in § 1.2110(c)(5)(iii) will be treated as though they were one person or entity and their ownership interests aggregated for purposes of determining an applicant's (or licensee's) compliance with the requirements of this section.

*     *     *     *     *

(c) Definitions—

*     *     *     *     *

(2) Controlling interests.

*     *     *     *     *

(ii) Calculation of certain interests.

*     *     *     *     *

18

(H) Any person who manages the operations of an applicant or licensee pursuant to a management agreement shall be considered to have a controlling interest in such applicant or licensee if such person, or its affiliate, has authority to make decisions or otherwise engage in practices or activities that determine, or significantly influence:

(1) The nature or types of services offered by such an applicant or licensee;

(2) The terms upon which such services are offered; or

(3) The prices charged for such services.

*       *       *       *       *

(5) Affiliate.

(i) An individual or entity is an affiliate of an applicant or of a person holding an attributable interest in an applicant if such individual or entity—

(A) Directly or indirectly controls or has the power to control the applicant, or

(B) Is directly or indirectly controlled by the applicant, or

(C) Is directly or indirectly controlled by a third party or parties that also controls or has the power to control the applicant, or

(D) Has an "identity of interest" with the applicant.

(ii) Nature of control in determining affiliation.

(A) Every business concern is considered to have one or more parties who directly or indirectly control or have the power to control it. Control may be affirmative or negative and it is immaterial whether it is exercised so long as the power to control exists.

Example. An applicant owning 50 percent of the voting stock of another concern would have negative power to control such concern since such party can block any action of the other stockholders. Also, the bylaws of a corporation may permit a stockholder with less than 50 percent of the voting

19

stock to block any actions taken by the other stockholders in the other entity. Affiliation exists when the applicant has the power to control a concern while at the same time another person, or persons, are in control of the concern at the will of the party or parties with the power to control.

(B) Control can arise through stock ownership; occupancy of director, officer or key employee positions; contractual or other business relations; or combinations of these and other factors. A key employee is an employee who, because of his/her position in the concern, has a critical influence in or substantive control over the operations or management of the concern.

(C) Control can arise through management positions where a concern's voting stock is so widely distributed that no effective control can be established.

Example. In a corporation where the officers and directors own various size blocks of stock totaling 40 percent of the corporation's voting stock, but no officer or director has a block sufficient to give him or her control or the power to control and the remaining 60 percent is widely distributed with no individual stockholder having a stock interest greater than 10 percent, management has the power to control. If persons with such management control of the other entity are persons with attributable interests in the applicant, the other entity will be deemed an affiliate of the applicant.

(iii) Identity of interest between and among persons. Affiliation can arise between or among two or more persons with an identity of interest, such as members of the same family or persons with common investments. In determining if the applicant controls or has the power to control a concern, persons with an identity of interest will be treated as though they were one person.

Example. Two shareholders in Corporation Y each have attributable interests in the same PCS application. While neither shareholder has enough shares to individually control Corporation Y, together they have the power to control Corporation Y. The two shareholders with these common investments (or identity in interest) are treated as though they are one person and Corporation Y would be deemed an affiliate of the applicant.
(A) Spousal affiliation. Both spouses are deemed to own or control or have the power to control interests owned or controlled by either of them, unless they are subject to a legal separation recognized by a court of competent

20

jurisdiction in the United States. In calculating their net worth, investors who are legally separated must include their share of interests in property held jointly with a spouse.

(B) Kinship affiliation. Immediate family members will be presumed to own or control or have the power to control interests owned or controlled by other immediate family members. In this context "immediate family member" means father, mother, husband, wife, son, daughter, brother, sister, father- or mother-in-law, son- or daughter-in-law, brother- or sister-in-law, step-father or -mother, step-brother or -sister, step-son or -daughter, half brother or sister. This presumption may be rebutted by showing that the family members are estranged, the family ties are remote, or the family members are not closely involved with each other in business matters.

Example. A owns a controlling interest in Corporation X. A's sister-in-law, B, has an attributable interest in a PCS application. Because A and B have a presumptive kinship affiliation, A's interest in Corporation Y is attributable to B, and thus to the applicant, unless B rebuts the presumption with the necessary showing.

(iv) Affiliation through stock ownership.

(A) An applicant is presumed to control or have the power to control a concern if he or she owns or controls or has the power to control 50 percent or more of its voting stock.

(B) An applicant is presumed to control or have the power to control a concern even though he or she owns, controls or has the power to control less than 50 percent of the concern's voting stock, if the block of stock he or she owns, controls or has the power to control is large as compared with any other outstanding block of stock.

(C) If two or more persons each owns, controls or has the power to control less than 50 percent of the voting stock of a concern, such minority holdings are equal or approximately equal in size, and the aggregate of these minority holdings is large as compared with any other stock holding, the presumption arises that each one of these persons individually controls or has the power to control the concern; however, such presumption may be rebutted by a showing that such control or power to control, in fact, does not exist.

21

(v) Affiliation arising under stock options, convertible debentures, and agreements to merge. Except as set forth in paragraph (c)(2)(ii)(A)(2) of this section, stock options, convertible debentures, and agreements to merge (including agreements in principle) are generally considered to have a present effect on the power to control the concern. Therefore, in making a size determination, such options, debentures, and agreements are generally treated as though the rights held thereunder had been exercised. However, an affiliate cannot use such options and debentures to appear to terminate its control over another concern before it actually does so.

Example 1 to paragraph (c)(5)(v). If company B holds an option to purchase a controlling interest in company A, who holds an attributable interest in a PCS application, the situation is treated as though company B had exercised its rights and had become owner of a controlling interest in company A. The gross revenues of company B must be taken into account in determining the size of the applicant.

Example 2. If a large company, BigCo, holds 70% (70 of 100 outstanding shares) of the voting stock of company A, who holds an attributable interest in a PCS application, and gives a third party, SmallCo, an option to purchase 50 of the 70 shares owned by BigCo, BigCo will be deemed to be an affiliate of company A, and thus the applicant, until SmallCo actually exercises its option to purchase such shares. In order to prevent BigCo from circumventing the intent of the rule which requires such options to be considered on a fully diluted basis, the option is not considered to have present effect in this case.

Example 3. If company A has entered into an agreement to merge with company B in the future, the situation is treated as though the merger has taken place.

Note to paragraph (c)(5)(v): Mutually exclusive contingent ownership interests, i.e., one or more ownership interests that, by their terms, are mutually exclusive of one or more other ownership interests, shall be calculated as having been fully exercised only in the possible combinations in which they can be exercised by their holder(s). A contingent ownership interest is mutually exclusive of another only if contractual language specifies that both interests cannot be held simultaneously as present ownership interests.

(vi) Affiliation under voting trusts.

(A) Stock interests held in trust shall be deemed controlled by any person who holds or shares the power to vote such stock, to any person who has the sole power to sell such stock, and to any person who has the right to revoke the trust at will or to replace the trustee at will.

(B) If a trustee has a familial, personal or extra-trust business relationship to the grantor or the beneficiary, the stock interests held in trust will be deemed controlled by the grantor or beneficiary, as appropriate.

(C) If the primary purpose of a voting trust, or similar agreement, is to separate voting power from beneficial ownership of voting stock for the purpose of shifting control of or the power to control a concern in order that such concern or another concern may meet the Commission's size standards, such voting trust shall not be considered valid for this purpose regardless of whether it is or is not recognized within the appropriate jurisdiction.

(vii) Affiliation through common management. Affiliation generally arises where officers, directors, or key employees serve as the majority or otherwise as the controlling element of the board of directors and/or the management of another entity.

(viii) Affiliation through common facilities. Affiliation generally arises where one concern shares office space and/or employees and/or other facilities with another concern, particularly where such concerns are in the same or related industry or field of operations, or where such concerns were formerly affiliated, and through these sharing arrangements one concern has control, or potential control, of the other concern.

(ix) Affiliation through contractual relationships. Affiliation generally arises where one concern is dependent upon another concern for contracts and business to such a degree that one concern has control, or potential control, of the other concern.

(x) Affiliation under joint venture arrangements.

(A) A joint venture for size determination purposes is an association of concerns and/or individuals, with interests in any degree or proportion, formed by contract, express or implied, to engage in and carry out a single,

23

specific business venture for joint profit for which purpose they combine their efforts, property, money, skill and knowledge, but not on a continuing or permanent basis for conducting business generally. The determination whether an entity is a joint venture is based upon the facts of the business operation, regardless of how the business operation may be designated by the parties involved. An agreement to share profits/losses proportionate to each party's contribution to the business operation is a significant factor in determining whether the business operation is a joint venture.

(B) The parties to a joint venture are considered to be affiliated with each other. Nothing in this subsection shall be construed to define a small business consortium, for purposes of determining status as a designated entity, as a joint venture under attribution standards provided in this section.

(xi) Exclusion from affiliation coverage. For purposes of this section, Indian tribes or Alaska Regional or Village Corporations organized pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.), or entities owned and controlled by such tribes or corporations, are not considered affiliates of an applicant (or licensee) that is owned and controlled by such tribes, corporations or entities, and that otherwise complies with the requirements of this section, except that gross revenues derived from gaming activities conducted by affiliate entities pursuant to the Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.) will be counted in determining such applicant's (or licensee's) compliance with the financial requirements of this section, unless such applicant establishes that it will not receive a substantial unfair competitive advantage because significant legal constraints restrict the applicant's ability to access such gross revenues.

(6) Consortium. A consortium of small businesses, very small businesses, entrepreneurs, or rural service providers is a conglomerate organization composed of two or more entities, each of which individually satisfies the definition of a small business, very small business, entrepreneur, or rural service provider as those terms are defined in this section and in applicable service-specific rules. Each individual member must constitute a separate and distinct legal entity to qualify.

*    *    *    *    *

(j) Designated entities must describe on their long-form applications how they satisfy the requirements for eligibility for designated entity status, and must list and summarize on their long-form applications all agreements that affect designated entity status such as partnership agreements, shareholder agreements, management agreements, spectrum leasing arrangements, spectrum resale (including wholesale) arrangements, spectrum use agreements, and all other agreements including oral agreements, establishing as applicable, de facto or de jure control of the entity. Designated entities also must provide the date(s) on which they entered into each of the agreements listed. In addition, designated entities must file with their long-form applications a copy of each such agreement. In order to enable the Commission to audit designated entity eligibility on an ongoing basis, designated entities that are awarded eligibility must, for the term of the license, maintain at their facilities or with their designated agents the lists, summaries, dates and copies of agreements required to be identified and provided to the Commission pursuant to this paragraph and to § 1.2114.

*     *     *     *     *

## 47 C.F.R. § 1.2111

**Code of Federal Regulations**
**Title 47. Telecommunication**
**Chapter I. Federal Communications Commission**
**Subchapter A. General**
**Part 1. Practice and Procedure**
**Subpart Q. Competitive Bidding Proceedings**
**General Procedures**

**§ 1.2111  Assignment or transfer of control: unjust enrichment.**

*     *     *     *     *

(b) Unjust enrichment payment: bidding credits.

(1) A licensee that utilizes a bidding credit, and that during the initial term seeks to assign or transfer control of a license to an entity that does not meet the eligibility criteria for a bidding credit, will be required to reimburse the

25

U.S. Government for the amount of the bidding credit, plus interest based on the rate for ten year U.S. Treasury obligations applicable on the date the license was granted, as a condition of Commission approval of the assignment or transfer. If, within the initial term of the license, a licensee that utilizes a bidding credit seeks to assign or transfer control of a license to an entity that is eligible for a lower bidding credit, the difference between the bidding credit obtained by the assigning party and the bidding credit for which the acquiring party would qualify, plus interest based on the rate for ten year U.S. Treasury obligations applicable on the date the license is granted, must be paid to the U.S. Government as a condition of Commission approval of the assignment or transfer. If, within the initial term of the license, a licensee that utilizes a bidding credit seeks to make any ownership change that would result in the licensee losing eligibility for a bidding credit (or qualifying for a lower bidding credit), the amount of the bidding credit (or the difference between the bidding credit originally obtained and the bidding credit for which the licensee would qualify after restructuring), plus interest based on the rate for ten year U.S. Treasury obligations applicable on the date the license is granted, must be paid to the U.S. Government as a condition of Commission approval of the assignment or transfer or of a reportable eligibility event (see § 1.2114).

\*       \*       \*       \*       \*

**47 C.F.R. § 1.2112**

**Code of Federal Regulations**
**Title 47. Telecommunication**
**Chapter I. Federal Communications Commission**
**Subchapter A. General**
**Part 1. Practice and Procedure**
**Subpart Q. Competitive Bidding Proceedings**
**General Procedures**

§ 1.2112  Ownership disclosure requirements for applications.

\*       \*       \*       \*       \*

(b) Designated entity status. In addition to the information required under paragraph (a) of this section, each applicant claiming eligibility for small business provisions or a rural service provider bidding credit shall disclose the following:

*     *     *     *     *

(2) As an exhibit to its application for a license, authorization, assignment, or transfer of control:

(i) List the names, addresses, and citizenship of all officers, directors, and other controlling interests of the applicant, as described in § 1.2110;

(ii) List any FCC–regulated entity or applicant for an FCC license, in which any controlling interest of the applicant owns a 10 percent or greater interest or a total of 10 percent or more of any class of stock, warrants, options or debt securities. This list must include a description of each such entity's principal business and a description of each such entity's relationship to the applicant;

(iii) List and summarize all agreements or instruments (with appropriate references to specific provisions in the text of such agreements and instruments) that support the applicant's eligibility as a small business under the applicable designated entity provisions, including the establishment of de facto or de jure control. Such agreements and instruments include articles of incorporation and by-laws, partnership agreements, shareholder agreements, voting or other trust agreements, management agreements, franchise agreements, spectrum leasing arrangements, spectrum resale (including wholesale) arrangements, and any other relevant agreements (including letters of intent), oral or written;

(iv) List and summarize any investor protection agreements, including rights of first refusal, supermajority clauses, options, veto rights, and rights to hire and fire employees and to appoint members to boards of directors or management committees;

(v) List separately and in the aggregate the gross revenues, computed in accordance with § 1.2110, for each of the following: the applicant, its affiliates, its controlling interests, and affiliates of its controlling interests;

27

and if a consortium of small businesses, the members comprising the consortium;

(vi) List and summarize, if seeking the exemption for rural telephone cooperatives pursuant to § 1.2110, all documentation to establish eligibility pursuant to the factors listed under § 1.2110(b)(4)(iii)(A).

(vii) List and summarize any agreements in which the applicant has entered into arrangements for the use of any of the spectrum capacity of the license that is the subject of the application; and

(viii) If claiming eligibility for a rural service provider bidding credit, provide all information to demonstrate that the applicant meets the criteria for such credit as set forth in § 1.2110(f)(4).

*        *        *        *        *

IN THE UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT

SNR WIRELESS LICENSECO, LLC,
                                    Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION AND UNITED STATES OF
AMERICA,
                                    Respondent.

No. 15-1330 (and
consolidated cases)

CERTIFICATE OF SERVICE

I, Maureen K. Flood, hereby certify that on February 26, 2016, I electronically filed the foregoing Brief for respondent with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

| | |
|---|---|
| Catherine E. Stetson, Esq.<br>Ari Q. Fitzgerald<br>Richard C. Kitchen<br>HOGAN LOVELLS US LLP<br>Columbia Square<br>555 13th Street, NW<br>Washington, DC 20004<br>*Counsel for: SNR Wireless Licenseco, LLC* | Alfred W. Putnam, Jr., Esq.<br>Mark F. Dever, Esq.<br>Dorothy A. Hickok<br>Mark H.M. Sosnowsky<br>DRINKER BIDDLE & REATH LLP<br>One Logan Square<br>18th & Cherry Streets<br>Philadelphia, PA 19103<br>*Counsel for: Northstar Wireless, LLC* |

| | |
|---|---|
| Robert J. Wiggers<br>Robert B. Nicholson<br>U.S. DEPARTMENT OF JUSTICE<br>Room 3224<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530<br>*Counsel for: USA* | Lawrence Spiwak, Esq.<br>PHOENIX CENTER FOR ADVANCED<br>LEGAL & ECONOMIC PUBLIC POLICY<br>STUDIES<br>5335 Wisconsin Avenue, NW<br>Suite 440<br>Washington, DC 20036<br>*Counsel for: Phoenix Center for*<br>*Advanced Legal & Economic Public*<br>*Policy Studies* |
| Harold J. Feld<br>Public Knowledge<br>1818 N Street, NW<br>Suite 410<br>Washington, DC 20036<br>*Counsel for: Public Knowledge* | Christopher J. Wright<br>Elizabeth A. Bonner<br>Paul J. Caritj<br>Timothy J. Simeone<br>Harris, Wiltshire & Grannis LLP<br>1919 M Street, NW<br>8th Floor<br>Washington, DC 20036<br>*Counsel for: Northstar Wireless,*<br>*LLC* |

*/s/ Maureen K. Flood*