NOT YET SCHEDULED FOR ORAL ARGUMENT

**Nos. 15-1330, 15-1331, 15-1332 & 15-1333**

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

SNR WIRELESS LICENSECO, LLC and
NORTHSTAR WIRELESS, LLC,

*Petitioners-Appellants,*

v.

FEDERAL COMMUNICATIONS COMMISSION, et al.,

*Respondents-Appellees.*

On Petition for Review and Notice of Appeal of
an Order of the Federal Communications Commission

**FINAL REPLY BRIEF FOR PETITIONERS-APPELLANTS**

Catherine E. Stetson
Ari Q. Fitzgerald
Andrew D. Selbst
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
(202) 637-5600
cate.stetson@hoganlovells.com
*Counsel for SNR Wireless LicenseCo,*
*LLC*

Dated: April 4, 2016

Christopher J. Wright
Timothy J. Simeone
Elizabeth Austin Bonner
Paul J. Caritj
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W., 8th Floor
Washington, D.C. 20036-3537
(202) 730-1300
cwright@hwglaw.com
*Counsel for Northstar Wireless, LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

GLOSSARY ................................................................................. vi

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT ..................................................................................4

I.   PETITIONERS REASONABLY RELIED ON BUREAU
     GUIDANCE AND THE FCC'S DISAVOWAL OF THAT
     PRECEDENT WAS ARBITRARY AND CAPRICIOUS. ..............................9

  A.  Petitioners Permissibly—Indeed, Necessarily—Modeled Their
      Agreements on Past Bureau-Approved Agreements....................10

    1.  The rules and published opinions cited in the Commission's
        brief do not support its decision here............................10

    2.  The Commission erroneously claims that Petitioners were not
        allowed to consider prior Bureau approvals in structuring their
        relationships. ....................................................14

  B.  The Commission's Proffered Distinctions from Prior Approved
      Agreements Are Unconvincing.........................................17

    1.  The Management Services Agreement..................................18

    2.  Interoperability Commitments......................................20

    3.  Joint Bidding......................................................22

    4.  Investor Protections..............................................24

    5.  Size of the Bids..................................................25

II.  THE COMMISSION MAY NOT IMPOSE PENALTIES ON
     PETITIONERS BECAUSE IT FAILED TO PROVIDE FAIR
     NOTICE OF ITS INTERPRETATION OF ITS RULES. ...............................26

III. THE COMMISSION'S PRACTICE REQUIRED IT TO PROVIDE
     AN OPPORTUNITY TO CURE................................................30

CONCLUSION ...............................................................................32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Comcast Corp. v. FCC*,
    526 F.3d 763 (D.C. Cir. 2008)..........................................................................16

*\*FCC v. Fox Television Stations, Inc.*,
    132 S. Ct. 2307 (2012)...........................................................................17, 28

*General Electric Co. v. EPA*,
    53 F.3d 1324 (D.C. Cir. 1995)...................................................................27, 28

*NetworkIP, LLP v. FCC*,
    548 F.3d 116 (D.C. Cir. 2008)...................................................................29

*New York State Energy Research and Development Authority v. FERC*,
    746 F.2d 64 (D.C. Cir. 1984)....................................................................17

*Radio Athens, Inc. (WATH) v. FCC*,
    401 F.2d 398 (D.C. Cir. 1968)...................................................................30

*Rollins Environmental Services v. EPA*,
    937 F.2d 649 (D.C. Cir. 1991)...................................................................28

*Satellite Broadcasting Co., Inc. v. FCC*,
    824 F.2d 1 (D.C. Cir. 1987).......................................................................26

*\*Trinity Broadcasting of Florida, Inc. v. FCC*,
    211 F.3d 618 (D.C. Cir. 2000).............................................................26, 28

STATUTES:

47 U.S.C. § 155(c)(3)...........................................................................15

47 U.S.C. § 309(j)(3)(B).........................................................................26

REGULATIONS:

47 C.F.R. § 0.131(a).............................................................................14

*\*Authorities on which we chiefly rely are marked with an asterisk.*

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

47 C.F.R. § 0.131(c)................................................................14

47 C.F.R. § 0.445(a)-(e)..........................................................16

47 C.F.R. § 0.445(e)..........................................................15, 16

47 C.F.R. § 1.2110(c)(2)(i) ..................................................1, 27

47 C.F.R. § 1.2110(c)(5)(xi) ......................................................4

**ADMINISTRATIVE MATERIALS:**

*Amendment of the Commission's Rules*,
   28 FCC Rcd. 11,479 (2013)....................................................20

*Amendment of the Commission's Rules*,
   29 FCC Rcd. 4610 (2014)......................................................21

Application of Advantage Spectrum, LP, FCC Form 601, ULS File
   No. 0006668843 (Feb. 9, 2016) ..............................................6

*Application of Alaska Native Wireless, LLC, FCC Form 601, ULS
   File No. 0000363827, Exhibit E (Aug. 2, 2002) ........................6, 19, 21, 22, 25

Application of AT&T Wireless Services 3 LLC, FCC Form 601, ULS
   File No. 0006666929 (Feb. 12, 2015)........................................6

Application of AWS 2014 Spectrum Bidco Corporation, FCC Form
   601, ULS File No. 0006670619 (Jul. 27, 2015) ..............................6

*Application of Baker Creek*,
   13 FCC Rcd. 18,709 (1998)................................................13, 14, 19, 22

Application of Cook Inlet Western Wireless, FCC Form 601, ULS
   File No. 01123CWL97, Exhibit F (Nov. 20, 1998)...........................22

Application of Denali Spectrum License, LLC, FCC Form 601, ULS
   File No. 0002774595, Exhibit D: Agreements and Other
   Instruments (Apr. 18, 2007)........................................6, 18, 19, 21, 25

*Application of Ellis Thompson Corp.*,
   9 FCC Rcd. 7138 (1994)....................................................12

*Application of Ellis Thompson Corp.*,
   10 FCC Rcd. 12,556 (1995)................................................12, 13, 18, 21

## TABLE OF AUTHORITIES

**Page(s)**

Application of King Street Wireless L.P., FCC Form 601, ULS File
    No. 0003379814, Exhibit D (Amended) (Dec. 31, 2008) ....................................6

Application of Royal Street Communications, LLC, FCC Form 601,
    ULS File No. 0002069525, Exhibit E (May 17, 2005) ........................................6

Application of Salmon PCS, LLC, FCC Form 601, ULS File No.
    0000365189 (Sept. 18, 2001)...............................................................................11

Application of Salmon PCS, LLC, FCC Form 601, ULS File No.
    0000365189, Credit Agreement (Sept. 20, 2001)..................................................8

Application of Salmon PCS, LLC, FCC Form 601, ULS File No.
    0000365189, Exhibit E (Feb. 11, 2001) ..............................................................22

Application of Salmon PCS, LLC, FCC Form 601, ULS File No.
    0000365189, LLC Agreement (Sept. 18, 2001)..................................................25

Application of Salmon PCS, LLC, FCC Form 601, ULS File No.
    0000365189, Management Agreement (Sept. 18, 2001)..............................19, 21

Application of Vista PCS, LLC, FCC Form 601, ULS File No.
    0002069013, Exhibit E - Agreements and Other Instruments
    (Mar. 7, 2005) ...............................................................................11, 19, 22

*Applications of Alaska Native Wireless, L.L.C.*,
    17 FCC Rcd. 4231 (2002)................................................................................7, 13

*Commercial Realty St. Pete, Inc.*,
    11 FCC Rcd. 15,374 (1996)................................................................................12

Cricket Communications, Inc., Denali Spectrum License, LLC and
    Denali Spectrum, LLC, Credit Agreement (July 13, 2006),
    amended by Amendment 1 (Sept. 28, 2006) ........................................................8

*Expanding the Economic and Innovation Opportunities of Spectrum
    Through Incentive Auctions*, DA 16-120 (rel. Feb. 3, 2016)..............................23

*Implementation of Section 309(j) of the Communications Act –
    Competitive Bidding*,
    10 FCC Rcd. 403 (1994).....................................................................................11

*Intermountain Microwave*,
    12 FCC 2d 559 (1963) .......................................................................................11

## TABLE OF AUTHORITIES

**Page(s)**

*Updating Part 1 Competitive Bidding Rules*,
    29 FCC Rcd. 12,426 (2014)................................................................................24

**Other Materials:**

PR Newswire, *Alaska Native Wireless Announces Successful*
    Completion of Federal Spectrum Auction (Jan. 26, 2001)..................................8

# GLOSSARY

AWS      Advanced Wireless Services

FCC      Federal Communications Commission

## INTRODUCTION AND SUMMARY OF ARGUMENT

Companies willing to spend billions of dollars in spectrum auctions must be given reasonable notice of the rules before doing so.  In this case, however, even though Petitioners modeled their agreements on agreements that had previously been approved by the Commission's Wireless Telecommunications Bureau, they were found to have violated a new "control" standard that *never* had been applied before.

The Commission maintains that Petitioners could have anticipated "the standard the Commission employed" in this case "by reading the regulations." FCC Br. 52 (citation and quotation omitted).  But the regulation the Commission repeatedly cites in support of its claim merely states that de facto control issues will be decided on a "case-by-case basis," along with a few irrelevant examples. 47 C.F.R. §1.2110(c)(2)(i).  The most useful guidance available, rather, was all of the agreements previously approved by the Bureau.  Lengthy summaries of those agreements that the Bureau had approved were publicly available and—bidders thought—provided detailed roadmaps to ensure that their agreements were permissible.  After all, what could be safer than modeling an agreement on previously approved agreements?

Accordingly, like dozens of bidders before them, Petitioners carefully modeled their agreements on that precedent.  Indeed, the vast majority of the

1

provisions in their agreements were virtually *identical* to the terms used to

structure Denali Spectrum Manager, LLC, which was approved by the Bureau and

which, in turn, was based on two earlier sets of Bureau-approved agreements.

Denali was controlled by Doyon, Limited, an Alaska Native Regional Corporation

that controls Petitioner Northstar.

The Commission does not deny that Petitioners' agreements track prior

Bureau-approved agreements. That is why the Commission was constrained to

issue a broad "disavow[al]" of all of those prior approvals. JA 683-84 (*Northstar*

*Wireless, LLC, SNR Wireless LicenseCo, LLC*, 30 FCC Rcd. 8887, ¶121 n.354

(2015) ("Order")). The Commission also now claims that the Bureau-approved

agreements are irrelevant because the approvals were "unpublished." But the

Commission's brief omits the most critical text in the regulation it cites, which

*expressly states* that parties may use all Commission documents against the

Commission—whether published or not. It was arbitrary, capricious, and contrary

to law for the Commission to simply "disavow" its own Bureau's decisions.

Even if this Court upholds the Order's *prospective* abandonment of Bureau

precedent, parties may not be penalized for relying on such precedent. Numerous

decisions of this Court require an agency to give regulated parties fair notice before

imposing penalties. The Commission does not dispute that Petitioners were

subjected to penalties totaling several billion dollars. And the Commission gave

no fair notice that Petitioners would face massive penalties for relying on past Bureau precedent.  A regulated company cannot reasonably be said to have "fair notice" of an agency's rules when the agency has to *disavow* its own staff's interpretation in order to find a violation.  The decision to deny bidding credits and impose other penalties on Petitioners should be vacated.

Finally, the Commission inexplicably departed from its practice of allowing parties to conform their agreements to the Commission's rules before imposing those penalties.  The Commission now attempts (again) to disown that longstanding practice, but it is Administrative Law 101 that the Commission cannot change course without providing a reasonable explanation for doing so.  If the Order otherwise survives judicial review, Petitioners should be allowed to cure any flaws in their agreements.

3

## ARGUMENT

The Commission's brief relies heavily on nearly twenty pages of purported facts suggesting that Petitioners are sham companies with no real interest in or ability to manage their own wireless networks. That characterization is central to the Commission's preferred narrative. It is also false, so we address it before responding to the Commission's legal arguments.

Northstar and SNR, like the previously approved designated entities Denali Spectrum License, Salmon PCS, and Alaska Native Wireless, are controlled by entities or individuals with extensive track records in the wireless business. Northstar, like Denali, is controlled by Doyon. JA 640-41 (Order ¶17). Doyon has numerous employees, professional management, extensive assets, substantial revenue, and a long history of involvement in the wireless industry.[1] Doyon was a controlling owner of Alaska Native Wireless, in which AT&T invested, and later partnered with Cricket Wireless, under agreements almost identical to those here, to form Denali. Denali, in turn, built out the greater Chicago area and portions of

---

[1] Although Doyon is an established business with substantial revenues, its subsidiaries may qualify as small businesses under 47 C.F.R. §1.2110(c)(5)(xi), which excludes the non-gaming revenues generated by Alaska Native Corporations from attribution to their subsidiaries. *See* JA 640- 41 (Order ¶¶17-18, 17 n. 58). The Commission's statement that Northstar reported zero attributable income is thus misleading.

Wisconsin with more than 900 cell sites, covering 18,000 square miles and a population of more than 11 million.[2]

SNR is controlled by John Muleta, an experienced entrepreneur with a broad background in spectrum auctions and wireless technology.  JA 639-40 (Order ¶14). Muleta served for approximately six years at the FCC, including as the Chief of the Wireless Telecommunications Bureau.  In the private sector, he served as a network engineer at GTE Corporation and Senior Vice President at PSINet, one of the first commercial Internet service providers.  Muleta was also a co-founder of M2Z Networks, Inc., which sought to use a portion of the AWS-3 band to deploy a free wireless broadband network.  Both Northstar and SNR therefore are well positioned to build out and operate networks using AWS-3 spectrum.

The Commission makes much of the fact that SNR and Northstar were formed a few months before the auction and lacked corporate officers or directors. But as the Commission knows well, *many* past designated entities and other Commission licensees have been newly formed entities with no officers, directors, or revenue at the time of the auction in which they participated.  The practice of creating special-purpose companies such as Petitioners for a range of legitimate

---

[2] JA 435 (Northstar Wireless, LLC, Opposition to Petitions to Deny, ULS File No. 0006670613, Attachment 2 (Declaration of Allen M. Todd) at 4 (May 18, 2015)).

business purposes, including acquiring and holding licenses, is permissible and widespread.[3]

The Commission also contends that all of Petitioners' profits will accrue to DISH and that Petitioners' agreements obligate them to repay their loans from DISH before realizing any profits. Both contentions are incorrect. Under their respective credit agreements with DISH, Petitioners may make "distributions or returns of capital," to their shareholders *before* the DISH loan is repaid. JA 1015;

---

[3] *See, e.g.*, Application of Alaska Native Wireless, LLC, FCC Form 601, ULS File No. 0000363827, Exhibit E at 1, 3 (Aug. 2, 2002) ("ANW Summary"); Application of Royal Street Communications, LLC, FCC Form 601, ULS File No. 0002069525, Exhibit E at 3 (May 17, 2005); Application of Denali Spectrum License, LLC, FCC Form 601, ULS File No. 0002774595, Exhibit D: Agreements and Other Instruments at 1, 6 (Apr. 18, 2007) ("Denali Summary"); Application of King Street Wireless L.P, FCC Form 601, ULS File No. 0003379814, Exhibit D (Amended) at 3 (Dec. 31, 2008); Application of AT&T Wireless Services 3 LLC, Form 601, ULS File No. 0006666929 (a search of the Delaware Division of Corporations reveals that AT&T Wireless Services 3 LLC was formed on August 29, 2014, two weeks before short forms for Auction 97 were due on September 12, 2014). Even in this auction, Petitioners were not alone in proceeding this way. Two other designated entity applicants with large communications company investments also reported no revenues for the three prior years, were formed immediately before the deadline to file applications to participate in the auction, and reported no officers or directors other than the controlling interest holders. *See* Application of Advantage Spectrum, LP, FCC Form 601, ULS File No. 0006668843 (Feb. 9, 2016); Application of AWS 2014 Spectrum Bidco Corporation, FCC Form 601, ULS File No. 0006670619 (Jul. 27, 2015). The Commission has not yet acted on those applications.

1063 (Credit Agreements[4] §6.16). Moreover, Petitioners' unremarkable repayment obligation entitles DISH (as a lender) only to a fixed payment—the amount of the loan plus interest—not participation in all of the enterprises' future profits.

The Commission also repeatedly suggests that the total amount that Petitioners bid at auction shows that DISH will be able to exert "leverage" over Petitioners. But the Commission offers no rationale for supposing that DISH would be able to obtain such "leverage" in contravention of specific terms of the parties' legally binding agreements. Under those agreements, for example, DISH enjoys no right to either approve or veto the business plans and budgets prepared by Petitioners. DISH has only a right to be "consult[ed]"—an investor protection the Commission has explicitly endorsed. *Applications of Alaska Native Wireless, L.L.C.*, 17 FCC Rcd. 4231, ¶16 (2002) ("ANW Bureau Order"). The Commission implies that DISH might covertly seek to secure a veto right by declining to lend additional funds. But the parties' credit agreements *obligate* DISH to lend sufficient funds to acquire any licenses for which Petitioners are the winning bidders, JA 985; 1033 (Credit Agreements def. "Acquisition Sub-Limit"), to fund working capital requirements, and to "meet the Borrower's and its Subsidiaries' Build-Out plans." JA 987, 996; 1035, 1044 (Credit Agreements def. "Build-Out Sub-

---

[4] References to "Credit Agreements," "LLC Agreements," and "Management Services Agreements" refer to both the Northstar and SNR versions of those agreements.

Limit", §2.2). The agreements do not permit DISH to punish Petitioners by withholding funds needed to build and operate their networks.

The Commission makes no attempt to explain why "leverage" is a concern here when it was not problematic in multi-billion dollar designated entity arrangements *approved* in the past. For example, Alaska Native Wireless and Salmon PCS were both financed with more than $2 billion in loans[5] without raising any "leverage" concerns, even though in Salmon PCS the lender was (as here) also the network manager. In Denali the lender also had management service responsibilities similar to those involved here, and the loans were by no means small: Denali was financed with more than $223 million in loans from Cricket Wireless.[6]

Finally, the Commission also ignores the fact that the Denali agreement resulted in a debt-to-equity ratio essentially identical to Petitioners' relative levels

---

[5] *See* PR Newswire, Alaska Native Wireless Announces Successful Completion of Federal Spectrum Auction (Jan. 26, 2001), http://www.prnewswire.com/news-releases/alaska-native-wireless-announces-successful-completion-of-federal-spectrum-auction-71110757.html; Application of Salmon PCS, LLC, FCC Form 601, ULS File No. 0000365189, Credit Agreement (Sept. 20, 2001).

[6] Cricket Communications, Inc., Denali Spectrum License, LLC and Denali Spectrum, LLC, Credit Agreement (July 13, 2006), http://www.sec.gov/Archives/edgar/data/1065049/000093639206000773/a22231ex v10w15.htm, amended by Amendment 1 (Sept. 28, 2006), http://www.sec.gov/Archives/edgar/data/1065049/000093639206001029/a24360ex v10w4w1.htm.

of indebtedness.  The Commission has never explained why the gross amount of the loan, and not the relative degree of indebtedness, makes a difference—and common sense suggests that to the extent "leverage" is a concern, it is the *degree* of indebtedness, not the loan amount, that matters.  Furthermore, while some of the arrangements here might not be permissible under the new rules promulgated by the Commission *after* the auction, nothing in the rules in effect at the time of the auction prohibited those arrangements.

## I.  PETITIONERS REASONABLY RELIED ON BUREAU GUIDANCE AND THE FCC'S DISAVOWAL OF THAT PRECEDENT WAS ARBITRARY AND CAPRICIOUS.

Northstar and SNR explained in their opening brief that they reasonably modeled their agreements with DISH on designated entity agreements previously approved by the Bureau.  Indeed, Appendix A of their brief demonstrates that virtually all of the provisions to which the Commission objected were directly based on Bureau-approved agreements.

The Commission makes little effort to deny this.  Instead, it argues that Petitioners could not properly rely on Bureau approvals.  That is wrong.  Past Bureau-approved agreements were the *best available source of information* to give meaning to the de facto control test in the auction context, and it was appropriate for Petitioners to rely on them.

### A.    Petitioners Permissibly—Indeed, Necessarily—Modeled Their Agreements on Past Bureau-Approved Agreements.

The Commission maintains that Petitioners were not entitled to look beyond the agency's "rules and published orders" for guidance on the control test.  FCC Br. 24.  But the Commission's attempt to circumscribe the universe of relevant agency guidance leaves regulated entities with virtually no guidance at all, and is legally unfounded.

### 1.    The rules and published opinions cited in the Commission's brief do not support its decision here.

Section 1.2110(c) of the Commission's rules—repeatedly cited in its brief—provides that "[d]e facto control is determined on a case-by-case basis."  47 C.F.R. §1.2110(c)(2)(i).[7]  On its face, then, that rule gives *zero* guidance about what does and does not constitute de facto control in the auction context.  The Commission argues that the rule "provides examples of affiliation that result in control," FCC Br. 6—but the Commission does not suggest that Petitioners' agreements ran afoul of any of those examples.  Nor can one derive from those examples any specific principles applicable in cases like this.

---

[7] Because the FCC changed its competitive bidding rules after Auction 97, all C.F.R. citations in Petitioners' briefs refer to the rules in place when Petitioners submitted their respective Form 175 Short-Form Applications.  *See* JA 634 (Order ¶3, n.5).

The "published orders" identified in the Commission's brief likewise do not provide adequate guidance. The Commission correctly notes that its 1994 Fifth MO&O[8] requires analysis of "the totality of circumstances in each particular case," and also warns that control "concerns are greatly increased when a single entity provides most of the capital and management services and is the beneficiary of the investor protections." FCC Br. 7 (quoting Fifth MO&O ¶96). Petitioners, of course, were aware of these general admonitions—but they fall far short of drawing the line between permissible and impermissible. After all, if the presence of a "single entity" providing significant "capital and management services" rendered an agreement impermissible, the Bureau-approved agreements in Denali, Vista PCS,[9] and Salmon PCS[10] would not have passed muster.

The Commission also points to its 1963 decision in *Intermountain Microwave*, 12 FCC 2d 559 (1963), but that case too fails to provide clear guidance. *Intermountain Microwave* identifies "six factors" relevant to control analysis, FCC Br. 7 (setting forth factors), but does not address how they apply to designated entity arrangements at all. Moreover, the Commission has recognized

---

[8] *Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, 10 FCC Rcd. 403 (1994) ("Fifth MO&O").

[9] Application of Vista PCS, LLC, FCC Form 601, ULS File No. 0002069013, Exhibit E - Agreements and Other Instruments (Mar. 7, 2005) ("Vista Summary").

[10] Application of Salmon PCS, LLC, FCC Form 601, ULS File No. 0000365189 (Sept. 18, 2001).

that "in the case of a proposed non-broadcast facility" that "is not yet constructed and there is no record of actual conduct," some of the *Intermountain Microwave* factors do *not* apply. *See Commercial Realty St. Pete, Inc.*, 11 FCC Rcd. 15,374, ¶15 (1996). And neither the Commission's brief nor the challenged Order even attempts to explain how Petitioners could have discerned from the remaining *Intermountain Microwave* factors that the agreements here would be found impermissible.

The Commission also cites *Application of Ellis Thompson Corp.*, 9 FCC Rcd. 7138 (1994), as a Commission-level precedent from which Petitioners could have derived guidance. But the limited guidance provided by *Ellis Thompson* supports *Petitioners*' arguments here, not the Commission's. Ellis Thompson Corporation had no employees other than Ellis Thompson himself, a seventy-seven-year-old retired welder from Vancouver, Washington, who won his license in a lottery. *See Application of Ellis Thompson Corp.*, 10 FCC Rcd. 12,554, ¶38 (ALJ 1995). The license covered Atlantic City, New Jersey. The Ellis Thompson Corporation hired an outside manager, Amcell, to provide the necessary construction and switching services, provide office space and personnel, and prepare operating and capital budgets. *Id.* ¶¶11-12, 21, 42, 40-43. Amcell provided all the necessary engineering work and was responsible for the identification of new cell sites. *Id.* ¶38. Under the parties' management services

12

agreement—terminable only for cause—Amcell would continue in its role for between ten and twenty years. *Id.* ¶19. Amcell also acquired a contractual right to subsequently purchase the system outright. *Id.* ¶38. The Commission ultimately found no control problem on those facts. *Id.* ¶63. It therefore is difficult to see how Petitioners could have discerned from *Ellis Thompson* that their agreements would be found wanting.

As for published Bureau precedents, the Commission discusses only *Alaska Native Wireless*[11] and *Baker Creek*,[12] maintaining that those decisions somehow provide clear guidance that Petitioners' agreements are faulty. It is again difficult to see how. In *Alaska Native Wireless*, the Bureau found the designated entity *eligible* for bidding credits, approving many of the same provisions later incorporated into the Denali agreements and adopted by Petitioners. *See, e.g.*, ANW Bureau Order ¶16 (approving investor's consulting with the applicant on business plan and budget and investor's right to approve "significant expenditures"). The Commission points out that *Alaska Native Wireless* reiterates the *Fifth MO&O*'s warning that situations where a substantial investor also provides management services will be "'subject to close examination.'" FCC Br.

---

[11] ANW Bureau Order.

[12] *Application of Baker Creek Commc'ns, L.P.*, 13 FCC Rcd. 18,709 (WTB 1998).

30 (quoting ANW Bureau Order ¶18). But, again, that "close examination" resulted in *approval* in Denali, Vista PCS, and Salmon PCS.

In *Baker Creek*, the Bureau's Public Safety and Private Wireless Division *did* find impermissible control—based on factors not present in Petitioners' agreements here. Like the other precedents cited by the Commission, *Baker Creek* contains little practical guidance for how to structure permissible investor relationships, but Petitioners heeded what guidance it does offer. In particular, the Division emphasized that Baker Creek's dominant investor could veto Baker Creek's business plan and budget, that the agreement strictly limited Baker Creek's ability to terminate for cause, and that Baker Creek lacked the ability to operate independently from its investor. *Baker Creek*, 13 FCC Rcd. at ¶¶18, 19, 22. Following *Baker Creek*, Petitioners' agreements give them significantly *more* control over their own operations than the applicants had in *Baker Creek*. *See infra* at 24, nn.18 & 24.

## 2. The Commission erroneously claims that Petitioners were not allowed to consider prior Bureau approvals in structuring their relationships.

As Petitioners have explained, the Bureau "[a]dministers all Commission spectrum auctions," 47 C.F.R. §0.131(c), and may "act[] for the Commission under delegated authority[] in all matters pertaining to the licensing and regulation of wireless telecommunications." *Id.* §0.131(a). In the auction context, "[a]ny order"

14

the Bureau issues "pursuant to" this delegated authority has "the same force and effect . . . as orders, decisions, reports, or other actions of the Commission."  47 U.S.C. §155(c)(3).

Petitioners—like many bidders before them—relied on Bureau-approved designated entity agreements to supply a roadmap for structuring appropriate relationships.  While the approvals themselves were not thoroughly explained in published opinions, *summaries* of the approved agreements, and in many cases the agreements themselves, *were* publicly available.  The Commission refers disparagingly to those documents as "[o]nly summaries."  FCC Br. 35.  Those mere "summaries," however, often run many dozens of pages—87 in the Denali approval—and contain verbatim or nearly verbatim versions of all of the important provisions of the agreements.  The summaries thus provide far more detail about past approved agreements than may be gleaned from the Bureau's opinions in *Baker Creek* or *Alaska Native Wireless*.  Those detailed summaries—together with the Bureau's approvals of the agreements after careful scrutiny and negotiation—provide *precisely* the kind of detailed information necessary to help companies structure acceptable strategic investor relationships.

The Commission's brief cites one of the agency's regulations for the proposition that only *published* Bureau determinations "may be relied upon, used or cited as precedent by the Commission or private parties."  47 C.F.R. §0.445(e).

15

Under this regulation, certain kinds of documents—including "[a]djudicatory opinions and orders of the Commission, or its staff acting on delegated authority," as well as "[t]exts . . . released through the Office of Media Relations," "[a]ll rulemaking documents or summaries thereof," and "[f]ormal policy statements and interpretations"—may be relied on "in any manner" if they are published.  *Id.* §0.445(a)-(e).

But the Commission omits an important phrase from that regulation that shows that past Bureau approvals *themselves* are fair game here.  The regulation states that if such documents are not published, they "may not be relied upon, used or cited as precedent, *except against persons who have actual notice of the document in question or by such persons against the Commission*."  *Id.* §0.445(e) (emphasis added).  Here, of course, Petitioners are citing those documents "against the Commission."

In circumstances like these, then, the question under this Court's cases is whether it is *reasonable* for regulated parties to view practices short of "decision making of the highest level," *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008) (citation omitted), as agency policy.  Pet. Br. 37.  Here, the answer is yes, because the Commission has chosen for decades and in 160 previous decisions to elaborate its de facto control standard through the *Bureau*'s case-by-case application of Commission rules.  *Id.* at 36-37.

16

The Commission also cites a number of its own decisions for the proposition that Petitioners cannot properly "divine agency policy from applications granted without explanation by its staff." FCC Br. 36. As an initial matter, Petitioners did not merely attempt to extrapolate general legal principles from unexplained approvals, but instead copied provisions (often verbatim) from agreements that already had been approved. If those approvals meant anything, they meant that the same agreement ought to be approved.

In any event, both this Court and the Supreme Court have recognized that agencies cannot pretend that informal agency guidance does not exist in considering whether regulated parties conformed their conduct to the law. *See* Pet. Br. 26; *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012) (citing *unpublished* Bureau-level decisions); *New York State Energy Research and Dev. Auth. v. FERC*, 746 F.2d 64 (D.C. Cir. 1984) (citing representations of agency officials). The Commission cannot point to its *own* decisions to undermine a reviewing *court's* rule that regulated entities are entitled to consider all of an agency's guidance.

### B.   The Commission's Proffered Distinctions from Prior Approved Agreements Are Unconvincing.

Like the challenged Order, the Commission's brief relies primarily on wholesale disavowal of the Bureau's guidance. But the Commission's brief also takes issue with specific aspects of Petitioners' agreements—although the Bureau

17

has repeatedly *approved* agreements containing the same provisions both individually and in combination.

### 1. The Management Services Agreement

As is common, each of the Petitioners entered into management services agreements (one for Northstar, one for SNR). FCC Br. 14. DISH's roles under the agreements are strictly technical—DISH must implement budget and business plans that *Petitioners* alone prepare, under Petitioners' direction and supervision. JA 802, 805, 816-17; 864, 867, 879; 1123; 1202 (Management Services Agreements §§2.2, 4.2(a), 9.7(a); LLC Agreements §6.5(b)).

The Commission finds fault with those management services agreements. But it has repeatedly approved similar agreements—including a virtually identical one in Denali.[13] Indeed, the Denali document was the product of careful negotiation with Bureau staff. *See* Pet. Br. 13 n.10. And *Ellis Thompson*, on which the Commission relies, explains that a management services agreement *is* permissible when the service manager (here, a DISH subsidiary) "is responsible for the routine administration of the system" under "parameters" set by the licensee. *Ellis Thompson* further found that the licensee was sufficiently in control of these "parameters" because it could "approve of every annual operating and capital budget." *Ellis Thompson Corp.*, 10 FCC Rcd. at ¶24. The Commission fails to

---

[13] *See* Denali Summary at 27-36.

explain why Petitioners' agreements transferred de facto control, but similar (and in some cases nearly identical) agreements did not for Salmon PCS,[14] Vista PCS,[15] and Denali,[16] where the service manager also provided financing, or in *Alaska Native Wireless*[17] and *Ellis Thompson*.

The Commission also suggests that the management fees DISH will pay Petitioners are not sufficient for Petitioners to deploy and operate a functioning wireless network. But the Commission omits the inconvenient fact that the approved management fee in Denali was *lower. See* Pet. Br. A5-A6. The management fee also is not the sole source of funding for Petitioners' operational needs: Petitioners may also borrow funds "necessary to meet the Borrower's and its Subsidiaries' Build-Out plans." JA 987; 1035 (Credit Agreements def. "Build-Out Sub-Limit"). The Commission's narrow focus on the management fee therefore does not accurately reflect Petitioners' abilities to build out and operate their networks.[18]

---

[14] Application of Salmon PCS, LLC, FCC Form 601, ULS File No. 0000365189, Management Agreement (Sept. 18, 2001) ("Salmon Management Agreement").

[15] Vista Summary at 7-10.

[16] Denali Summary at 27-36.

[17] ANW Summary at 17.

[18] In *Baker Creek*, the Division focused on Baker Creek's ability to terminate its management services agreement only for cause, and then only when the manager failed to use "reasonable efforts." 13 FCC Rcd. ¶18. In contrast, Petitioners' management services agreements permit them to terminate DISH at will with one

### 2.    Interoperability Commitments

Petitioners' respective agreements with DISH contained "interoperability" provisions requiring that Petitioners select network technologies that are interoperable with DISH's network technology—meaning, for example, that subscribers' cell phones will work on each company's network.  The Commission claims that these provisions might "restrict SNR and Northstar from critical decisions that would normally remain within an independent entity's control."  JA 673 (Order ¶94).

However, as a practical matter there is currently *no* real technology choice available to *any* carrier seeking to deploy mobile wireless service.  *All* U.S. carriers are moving to rely solely on a technology called LTE ("long-term evolution") or technologies that are backwards-compatible with LTE.  Indeed, many of the Commission's technical rules for operation in the AWS-3 band assume the use of LTE.[19]  Any carrier seeking to use a different technology for this spectrum will be at a significant disadvantage.  That is why the Commission has *mandated*

---

year's notice and an increase in the interest rate payable to DISH.  JA 818; 881 (Management Services Agreements §10.2(a)(iv)).

[19] *See, e.g.*, *Amendment of the Commission's Rules*, 28 FCC Rcd. 11,479 ¶¶99, 102 (2013).

interoperability in the AWS-3 spectrum at issue here,[20] and likewise has suggested it might do the same for DISH's AWS-4 spectrum if the industry does not do so voluntarily.[21]

Moreover, Petitioners' interoperability commitments only require Petitioners to select technologies *interoperable* with DISH's, not the same as DISH's.  *See* JA 1090; 1169 (LLC Agreements def. "Business").

Finally, and yet again, the Commission has approved the very same provisions—using identical language—in Denali,[22] and has approved similar agreements in many other cases.[23]  The Commission argues that those agreements are distinguishable from these agreements because those applicants' interoperability commitments reflected the applicants' own choices to use technology already deployed by their network partners, whereas DISH has not yet chosen a network technology.  But earlier, Bureau-approved agreements also required the applicants to make their networks compatible with technologies chosen by their investors "*from time to time*," *see, e.g.*, Denali Summary at 6, 8,

---

[20] *See Amendment of the Commission's Rules*, 29 FCC Rcd. 4610 ¶¶228-229 (2014).

[21] *Id.* ¶231.

[22] Denali Summary at 6, 8, 62, 69.

[23] Salmon Management Agreement at 11; ANW Summary at 12; *Ellis Thompson Corp.*, 10 FCC Rcd. at ¶¶10-13.

68-69—meaning that under those agreements the investor could change its

technology and the applicant would have to follow suit. Just so here. Petitioners'

interoperability commitments are thus functionally indistinguishable from those

the Commission has approved.[24]

### 3.    Joint Bidding

The Commission also contends that the agreement governing Petitioners'

joint bidding behavior demonstrates DISH's control. But again, Denali entered

into an *identical* agreement with Cricket Wireless, and the Commission approved

Denali's bidding credits without raising any joint-bidding concerns.[25]  The

Commission also previously approved several other similar agreements.[26]

Moreover, the practices the Commission now claims are impermissible

represent textbook joint bidding behavior *permitted* under the Commission's rules

for this auction. Indeed, the Commission recently reiterated that "SNR's and

Northstar's bidding activity did not violate the Commission's rules governing

---

[24] The interoperability concerns raised in *Baker Creek* do not apply here. In *Baker Creek*, the Division observed that Baker Creek's network would be technically unable to function independent of its investor's. 13 FCC Rcd. at ¶22. This is not true here, and the Commission does not contend otherwise.

[25] *Id*. at 25-26.

[26] Application of Salmon PCS, LLC, FCC Form 601, ULS File No. 0000365189, Exhibit E at 13-14 (Feb. 11, 2001); ANW Summary at 14-15; Vista Summary at 11-12; Application of Cook Inlet Western Wireless, FCC Form 601, ULS File No. 01123CWL97, Exhibit F (Nov. 20, 1998).

Auction 97."[27]  To be sure, the Commission's *new* rules now proscribe some of the

bidding activities that concerned the Commission here.[28]  But that regime change

only confirms that this behavior was permitted at the time of this auction.

The Commission's lawyers nevertheless criticize Petitioners for not "bidding

against one another."  FCC Br. 19.  It is not clear what Commission's counsel

thinks "joint bidding" is if it believes bidders bidding jointly will bid against each

other in the same way that non-joint-bidders would.  But in any event, Petitioners'

failure to bid against one another is not evidence of DISH's control.[29]  Rather,

Petitioners understood that to build a nationwide network that seamlessly offers

service to consumers without regard to who holds the license in a particular area,

they needed to obtain as many licenses as possible for as low a price as possible.

That is entirely consistent with the purpose of joint bidding: "Joint bidding . . .

[can] enable participation in auctions by those otherwise without sufficient

financial resources to bid, or otherwise reduce entry costs into a geographic area or

---

[27] *Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, DA 16-120, ¶26 (rel. Feb. 3, 2016).

[28] *See* JA 532 (*Updating Part 1 Competitive Bidding Rules*, 30 FCC Rcd. 7493 ¶177 *et seq.* (2015) ("2015 Reform Order")).

[29] The Commission also tersely criticizes Petitioners for one instance where *SNR* withdrew a bid and incurred an $11 million payment that enabled *Northstar* to purchase the license for $11 million less than SNR's bid amount.  This may well reflect joint bidding behavior, but it does not show control of either entity by *DISH*.

enable the joint bidders to compete more robustly against other competitors in the marketplace."[30]

Finally, the Commission suggests that a different analysis should apply here than in previous control cases because DISH entered into bidding agreements with *two* designated entities rather than just one. But the Commission fails to explain why this should make any difference, or how DISH's joint bidding agreement with SNR could possibly affect its level of influence over Northstar, or vice versa. The Commission merely asserts that Petitioners' joint bidding behavior "demonstrated they were not acting in their own individual interests but were acting with a common goal." FCC Br. 48 (quotation and alterations omitted). But, again, a "common goal" is the very purpose of joint bidding.

### 4.    Investor Protections

The Commission next contends that the investor protection provisions in the agreements show control by DISH. That, again, is not so. Petitioners have the right to prepare their annual budgets. DISH has no authority to draft, approve, veto, or modify those budgets; it has a right only to be "consulted." JA 802, 805, 816-17; 864, 867, 879; 1123; 1202 (Management Services Agreements §§2.2, 4.2(a), 9.7(a); LLC Agreements §6.5(b)). Petitioners must seek DISH's consent for deviation from a budget line item by more than 10 percent. JA 1099; 1178 (LLC Agreements def.

---

[30] *Updating Part 1 Competitive Bidding Rules*, 29 FCC Rcd. 12,426, ¶125 (2014).

"Significant Matter" (xvi)).  Once again, however, the Bureau has repeatedly approved investor protections that give shareholders the right to approve budget deviations, as well as similar language providing for investor review of deviations from individual budget line items.  It did so for Salmon PCS, where it approved provisions requiring investor approval of line-item deviations in excess of $500,000 and deviations in excess of 10 percent from the annual budget,[31] and for Alaska Native Wireless and Denali, each of which also required approval for overall deviations in excess of 10 percent.[32]

The Commission (again) does not explain why it has taken an inconsistent position here.  Instead, it suggests that a "purely financial investor" would not have any reason to seek protection from significant, unexpected deviations from a designated entity's annual budget.  But it is hard to imagine what could be *more* relevant to a "purely financial investor" than a designated entity's ability to stay on budget.

### 5.    Size of the Bids

The Commission also cites the amount of Petitioners' bids as purported cause for concern.  But the Commission has never before suggested that the sheer

---

[31] S*ee* Application of Salmon PCS, LLC, FCC Form 601, ULS File No. 0000365189, LLC Agreement §6.1(g)(xiii) (Sept. 18, 2001).

[32] Denali Summary at 10; ANW Summary at 4.

size of a designated entity's bids—any more than its amount of indebtedness, *see supra* at 7-9—is any indication of an improper investor relationship.  A "bid size" limitation would be fundamentally misguided, in any event.  The designated entity program was designed to "promot[e] economic opportunity and competition" and "avoi[d] excessive concentration of licenses" by allowing a more diverse range of applicants to participate in spectrum auctions and compete in the marketplace. 47 U.S.C. §309(j)(3)(B).  Punishing new entrants like Petitioners for placing the large bids necessary to compete with large incumbent providers would undermine this objective by restricting them to niche markets.  Indeed, it appears that the Commission's real concern is with the size of the bidding credit discount—and while the Commission's new rules limit the amount of bidding credits available to designated entities, JA 504 (2015 Reform Order ¶114), those rules were not promulgated until after this auction.

## II.    THE COMMISSION MAY NOT IMPOSE PENALTIES ON PETITIONERS BECAUSE IT FAILED TO PROVIDE FAIR NOTICE OF ITS INTERPRETATION OF ITS RULES.

Even if the Commission *could* permissibly disavow the Bureau's precedents prospectively, the Commission may not penalize Petitioners for acting on a reasonable interpretation of the control rules in place at the time of the auction. *See Satellite Broad. Co., Inc. v. FCC*, 824 F.2d 1 (D.C. Cir. 1987); *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618 (D.C. Cir. 2000).

The parties agree on two key points here.  First, the Commission does not dispute that both the denial of bidding credits and the imposition of default payments were *penalties*.  *See* Pet. Br. 54-56.  Second, the parties agree that this case "represented the Commission's first application in the designated entity context" of the "totality-of-the-circumstances approach to determining control." FCC Br. 49.  That leaves a single question: whether the Commission provided fair notice of its control rules before it applied them to penalize Petitioners.

It did not.  Indeed, this case has a feature that many others do not share: Here, Petitioners' understanding of the rules was obviously reasonable because it was shared by the Bureau.[33]

The Commission nevertheless maintains that SNR and Northstar "should have received" fair notice of the Commission's de facto control rules "by reading the regulations."  FCC Br. 52 (quotation marks omitted).  That claim is meritless; as we have explained, section 1.2110(c)(2)(i) says only that "[d]e facto control is determined on a case-by-case basis" and gives examples of control not relevant here.  A regulation that does not provide a standard *at all* plainly cannot provide fair notice "with ascertainable certainty."  *Gen. Elec. Co. v. EPA*, 53 F.3d 1324,

---

[33] It is noteworthy that the Commission took the unusual step of acting on Petitioners' applications for bidding credits at the Commission level rather than allowing the Bureau to act on delegated authority.  The Commission presumably did so because it knew that the agreements were permissible under Bureau precedent, as the Commission further recognized by disavowing that precedent.

1329 (D.C. Cir. 1995) (citations omitted).  Moreover, the Commission knows how to provide fair notice—in its recent rulemaking proceeding, it capped bidding credits, prohibited joint bidding agreements, and precluded multiple auction applications—but the Commission rightly does not contend that the rules it adopted by means of a separate rulemaking proceeding apply to this auction.

This Court's cases—largely ignored by the Commission—confirm Petitioners' argument.  For example, in *Rollins Environmental Services (NJ) Inc. v. EPA*, 937 F.2d 649, 654 (D.C. Cir. 1991), this Court rejected the Environmental Protection Agency's imposition of a penalty—even where its new interpretation of its own regulations was reasonable and entitled to deference—because at the time of the violation the agency "might have . . . given [its] current interpretation" of its rules, or it "might have given [petitioner] the opposite advice."  Similarly, this Court in *Trinity Broadcasting* held that the Commission had reasonably interpreted its minority-preference rules to require de facto as well as de jure control by members of minority groups.  211 F.3d at 625-26.  But it went on to hold that the Commission could not penalize Trinity Broadcasting for ceding actual control to non-minorities, because Trinity's interpretation *also* was reasonable.  *Id*. at 628-32.

In addition, the Supreme Court in *Fox* cited unpublished staff letters in concluding that broadcasters had insufficient guidance that brief nudity would be penalized.  132 S. Ct. at 2317-19.  So too here, and then some:  In order to flesh

28

out a vague regulation, Petitioners actually *conformed* to the Bureau's interpretation by reviewing previous Bureau approvals and the publicly available documents (either agreement summaries or the agreements themselves) on which those approvals were based. The Commission purports to distinguish *Fox* on the ground that the unpublished staff letters were used "to rebut the government's claim that broadcasters would otherwise have been on notice of what was required." FCC Br. 53-54. It is difficult to see how that helps the FCC. Here the Bureau's approvals not only rebut the claim that Petitioners would otherwise have been on notice of what was required; they provide the best guidance available concerning what *was* required.

Rather than further engage on all of these cases, the Commission invokes *NetworkIP, LLP v. FCC*, 548 F.3d 116, 125 (D.C. Cir. 2008). But *NetworkIP* is entirely inapposite. There, the challenger proposed an interpretation of the Commission's payphone rules that was contrary to the Commission's, and which rendered the rules hopelessly vague. The Court found that the rule *could* be read as the challenger suggested, but that the FCC's interpretation was the "most natural" one. Here, in contrast, Petitioners had the *same* interpretation as the Bureau, and the Commission adopted a new interpretation.

## III.    THE COMMISSION'S PRACTICE REQUIRED IT TO PROVIDE AN OPPORTUNITY TO CURE.

The Bureau has long maintained a consistent practice of permitting designated entities to amend their agreements after spectrum auctions to resolve any potential control problems.  The Commission does not dispute the existence of that practice.  Instead, it asserts that it had no obligation to extend the same opportunity to Petitioners because that practice was followed by the Bureau, not the full Commission.  FCC Br. 54.

It is immaterial that there has never been a Commission-level decision articulating this practice.  As we have explained, the Bureau acts with authority delegated by the Commission; the Commission therefore is not free to simply "disavow" uniform agency practice where that practice is the only source of clarity on the Commission's control rules.  *See* Pet. Br. 49-56.  The full Commission could, of course, alter that practice *prospectively*.  But it cannot do so without explaining the departure and giving regulated entities fair notice of the change.  "[E]lementary fairness compels clarity."  *Radio Athens, Inc., (WATH) v. FCC*, 401 F.2d 398, 404 (D.C. Cir. 1968).

The Commission now proposes to alter its rules yet again, this time by way of counsel's post hoc rationalization.  The FCC's brief announces that post-auction changes made to effectuate the parties' intent to comply with the designated entity rules would amount to "major amendments" requiring dismissal of the application.

FCC Br. 55.  The Commission thus apparently now believes that the many

opportunities to cure that the Bureau has extended over the past twenty years were

all "substantial change[s] in ownership or control" that should have required those

applications to be dismissed and re-filed.  That view is not only new; it is

completely unreasonable.  Many entities that have sought to wade through the

Commission's murky control jurisprudence have needed additional Bureau

guidance.  The Commission has repeatedly permitted such changes without

dismissing the application or declaring the changes "major amendments."  And no

Commission rule requires that those amended applications be dismissed.

The Commission also appears to argue that abandoning this practice was

harmless error.  According to the Commission, SNR's and Northstar's agreements

with DISH could not have been cured because (1) the Commission's order "was

based . . . on the combined effect of dozens of provisions" and (2) amendment

would not have changed Petitioners' joint bidding behavior.  FCC Br. 55-56.

Neither of these arguments is persuasive.  First, de facto control is determined by a

totality-of-the-circumstances test under which all of an agreement's terms must be

considered together.  The FCC thus cannot credibly predict that its error would be

harmless because it has no idea what mix of terms the parties would ultimately

adopt.  Second, Petitioners' permissible joint bidding behavior would not render

futile any opportunity to cure, for the same reason.  The Commission did not

conclude that joint bidding behavior, *standing alone*, gave rise to incurable control problems; it was one of several factors necessary to its conclusion that DISH controlled Northstar and SNR.  JA 677-78 (Order ¶109); FCC Br. 33.  If, for example, the Commission's new approach forbids interoperability agreements where the investor has not yet chosen a technology, Petitioners and DISH could likely agree to choose the technology up front.  Thus, an opportunity to cure plainly would not be a useless exercise.

## CONCLUSION

For the foregoing reasons, and those in the opening brief, the Court should vacate the Commission's decision to deny bidding credits.  At a minimum, the case should be remanded to permit Petitioners to obtain bidding credits by conforming their agreements to the applicable control standards.

Respectfully submitted,

s/  Christopher J. Wright

| | |
|---|---|
| Catherine E. Stetson | Christopher J. Wright |
| Ari Q. Fitzgerald | Timothy J. Simeone |
| Andrew D. Selbst | Elizabeth Austin Bonner |
| HOGAN LOVELLS US LLP | Paul J. Caritj |
| 555 Thirteenth Street, N.W. | HARRIS, WILTSHIRE & GRANNIS LLP |
| Washington, D.C. 20004-1109 | 1919 M Street, N.W., 8th Floor |
| (202) 637-5600 | Washington, D.C. 20036-3537 |
| cate.stetson@hoganlovells.com | (202) 730-1300 |
| *Counsel for SNR Wireless LicenseCo, LLC* | cwright@hwglaw.com |
| | *Counsel for Northstar Wireless, LLC* |

32

## CERTIFICATE OF COMPLIANCE

I, Christopher J. Wright, hereby certify that the foregoing brief contains 6,956 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman.

/s/ Christopher J. Wright
Christopher J. Wright

April 4, 2016

## CERTIFICATE OF SERVICE

I, Christopher J. Wright, hereby certify that on this 4th day of April 2016 I caused the foregoing reply brief to be filed via the Court's CM/ECF system, which caused that document to be served on all parties or their counsel.

/s/ Christopher J. Wright
Christopher J. Wright

April 4, 2016